

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2008

# Abu-Jamal v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 01-9014

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Abu-Jamal v. Horn" (2008). *2008 Decisions*. Paper 1341.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1341

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 01-9014 & 02-9001

_____

MUMIA ABU-JAMAL,
a/k/a WESLEY COOK

Mumia Abu-Jamal,
Appellant at No. 02-9001

v.

MARTIN HORN,
PENNSYLVANIA DIRECTOR OF CORRECTIONS;
CONNER BLAINE, SUPERINTENDENT, SCI GREENE;
DISTRICT ATTORNEY FOR PHILADELPHIA COUNTY;
THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA,
Appellants at No. 01-9014

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 99-cv-5089

(Honorable William H. Yohn Jr.)

Argued May 17, 2007
Before: SCIRICA, *Chief Judge*,
AMBRO and COWEN, *Circuit Judges*.

(Filed March 27, 2008)

HUGH J. BURNS, JR., ESQUIRE (ARGUED)
RONALD EISENBERG, ESQUIRE
Office of District Attorney
Three South Penn Square
Philadelphia, Pennsylvania 19107-3499
        Attorneys for Appellants/Cross-Appellees,
        Martin Horn, Pennsylvania Director of Corrections;
        Conner Blaine, Superintendent, SCI Greene;
        District Attorney for Philadelphia County;
        The Attorney General of the State of Pennsylvania

ROBERT R. BRYAN, ESQUIRE (ARGUED)
2088 Union Street, Suite 4
San Francisco, California 94123

JUDITH L. RITTER, ESQUIRE (ARGUED)
Widener University School of Law
P.O. Box 7474
4601 Concord Pike

Wilmington, Delaware 19803
        Attorneys for Appellee/Cross-Appellant,
        Mumia Abu-Jamal

CHRISTINA A. SWARNS, ESQUIRE (ARGUED)
NAACP Legal Defense and Educational Fund, Inc.
99 Hudson Street, Suite 1600
New York, New York 10013
        Attorney for Amicus Curiae-Appellee,
        The NAACP Legal Defense and Educational Fund, Inc.

JILL SOFFIYAH ELIJAH, ESQUIRE
Criminal Justice Institute
Harvard Law School
301 Austin Hall
1515 Massachusetts Avenue
Cambridge, Massachusetts 02138
        Attorney for Amici Curiae-Appellees,
        National Lawyers Guild,
        National Conference of Black Lawyers,
        International Association of Democratic Lawyers,
        Charles Hamilton Houston Institute for
            Race & Justice of Harvard Law School,
        Southern Center for Human Rights,
        National Jury Project

OPINION OF THE COURT

3

SCIRICA, *Chief Judge*.

This petition for collateral review under 28 U.S.C. § 2254 came to us more than two decades after trial. In 1982, Mumia Abu-Jamal was convicted and sentenced to death in a Pennsylvania court for the murder of Philadelphia Police Officer Daniel Faulkner. Following denial of his appeals in state court, Abu-Jamal filed a petition for a writ of habeas corpus in federal district court. The District Court vacated his death sentence and granted a new penalty hearing, but denied all other relief, affirming the judgment of conviction. The Commonwealth of Pennsylvania appealed the order vacating the death penalty. Abu-Jamal appealed his conviction.

We consider four issues on appeal: (1) whether the Commonwealth's use of peremptory challenges violated Abu-Jamal's constitutional rights under *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) whether the prosecution's trial summation denied Abu-Jamal due process; (3) whether Abu-Jamal was denied due process during post-conviction proceedings as a result of judicial bias; and (4) whether the jury charge and sentencing verdict sheet violated Abu-Jamal's constitutional rights under *Mills v. Maryland*, 486 U.S. 367 (1988), and *Boyde v. California*, 494 U.S. 370 (1990). We will affirm the judgment of the District Court.

## I.

On December 9, 1981, between three thirty and four

o'clock in the morning, Philadelphia Police Officer Daniel Faulkner made a traffic stop of a Volkswagen driven by William Cook, Abu-Jamal's brother, on Locust Street between 12th and 13th Streets, in Philadelphia. Officer Faulkner radioed for back-up assistance, and both men exited their vehicles. A struggle ensued, and Officer Faulkner tried to secure Cook's hands behind his back. At that moment, Abu-Jamal, who was in a parking lot on the opposite side of the street, ran toward Officer Faulkner and Cook. As he approached, Abu-Jamal shot Officer Faulkner in the back. As Officer Faulkner fell to the ground, he was able to turn around, reach for his own firearm, and fire at Abu-Jamal, striking him in the chest. Abu-Jamal, now standing over Officer Faulkner, fired four shots at close range. One shot struck Officer Faulkner between the eyes and entered his brain.

Within a minute of Officer Faulkner's radio call, Officers Robert Shoemaker and James Forbes responded. Robert Chobert, a taxi cab driver who had just let out a passenger at 13th and Locust, stopped the officers before they arrived at the scene and notified them an officer had just been shot. Officer Shoemaker then approached the parked Volkswagen on foot and observed Abu-Jamal sitting on the curb. Despite Officer Shoemaker's repeated orders to freeze, Abu-Jamal did not remain still and reached for an object Officer Shoemaker could not yet identify. As Officer Shoemaker inched closer, he saw a revolver on the ground close to Abu-Jamal's hand. Officer Shoemaker kicked Abu-Jamal in the chest to move him away

5

from the gun, and then kicked the gun out of Abu-Jamal's reach. Officer Shoemaker then motioned for Officer Forbes to watch Abu-Jamal while Shoemaker attended to Officer Faulkner. During this time, Officer Forbes also searched Cook, who had remained at the scene and was standing near the wall of an adjacent building. Cook made only a single statement: "I had nothing to do with it."

Additional officers arrived on the scene. Officer Faulkner was immediately rushed to Thomas Jefferson University Hospital, where he was later pronounced dead. Officers took Abu-Jamal into custody. He resisted arrest while officers moved him to a police van and tried to handcuff him. Abu-Jamal was also taken to Thomas Jefferson University Hospital. While Abu-Jamal was waiting for treatment in the emergency room's lobby, Priscilla Durham, a security guard on duty at the hospital, heard Abu-Jamal twice repeat, "I shot the motherfucker, and I hope the motherfucker dies." Officer Gary Bell also heard Abu-Jamal make this statement. Hospital personnel then took Abu-Jamal into the emergency room for treatment.

Officer Forbes recovered two weapons from the scene. A standard police-issue Smith & Wesson .38 caliber Police Special revolver, registered and issued to Officer Faulkner, with one spent Remington .38 special cartridge, was found on the street about five feet away from Officer Faulkner. Ballistic testing later confirmed the bullet that struck Abu-Jamal was fired from Officer Faulkner's revolver. A Charter Arms .38

6

caliber revolver containing five "Plus-P" high-velocity spent cartridges was found on the sidewalk near Abu-Jamal. Abu-Jamal had purchased this revolver in June 1979 and it was registered in his name. Officer Anthony Paul, supervisor of the Firearms Identification Unit in the Laboratory Division of the Philadelphia Police Department, testified at trial that the bullet recovered from Officer Faulkner's head was badly mutilated and could not be matched with a specific firearm. Officer Paul also testified that the recovered bullet specimen had eight lands and grooves with a right hand direction of twist, which was consistent with a bullet fired from a Charter Arms revolver.

The Commonwealth presented four eye-witnesses at trial. Cynthia White testified she saw Abu-Jamal run out of a parking lot on Locust Street as Officer Faulkner attempted to subdue Cook, and saw Abu-Jamal shoot Officer Faulkner in the back. She testified she then watched Officer Faulkner stumble and fall, and then saw Abu-Jamal hover over Officer Faulkner, shoot him a few more times at a close distance, and then sit down on the curb. Robert Chobert testified he heard a shot, looked up, saw Officer Faulkner fall to the ground, and then saw Abu-Jamal fire a few shots into Officer Faulkner. At the scene, Chobert identified Abu-Jamal as the person who shot Officer Faulkner. Michael Scanlon testified he witnessed an assailant, whom he could not identify, shoot Officer Faulkner from behind, then watched the officer fall, and saw the assailant stand over the officer and shoot him in the face. Albert Magliton testified he saw Abu-Jamal run across the street from the

7

parking lot, then he heard shots and saw Officer Faulkner on the ground and Abu-Jamal on the curb. Magliton identified Abu-Jamal as the shooter, both at the scene and at trial.

On December 15, 1981, Anthony Jackson was appointed counsel for Abu-Jamal. Abu-Jamal was arraigned on charges of first degree murder and other related charges. The court granted Abu-Jamal's request to proceed *pro se* and the court designated Jackson, who had spent five months preparing for trial, as back-up counsel.

A jury trial commenced on June 7, 1982. Abu-Jamal was disruptive, uncooperative, and hostile. He repeatedly insisted that John Africa, a social activist who was not a lawyer, be appointed as counsel, even after the court denied this request. Abu-Jamal's conduct necessitated his removal from proceeding *pro se* for the remainder of the trial, and at times caused him to be physically removed from the courtroom. The jury was instructed against drawing negative inferences from his removal. Jackson, who was present throughout the entire trial and was reinstated as primary counsel when Abu-Jamal was removed, kept Abu-Jamal fully informed throughout the proceedings.

During the lengthy trial, Jackson cross-examined each witness called by the prosecutor. Abu-Jamal presented seventeen witnesses: eight fact witnesses and nine character witnesses. Neither Abu-Jamal nor Cook testified at trial. On July 2, 1982, the jury found Abu-Jamal guilty of first degree murder and of possessing an instrument of a crime.

8

On July 3, 1982, the jury heard evidence and argument in a penalty phase hearing. Later that day, the jury returned a sentence of death. The jury found one aggravating circumstance, killing a police officer acting in the line of duty, and one mitigating circumstance, Abu-Jamal's lack of a significant criminal record. The court denied post-trial motions on May 25, 1983, and imposed a sentence of death. The court then appointed new appellate counsel for Abu-Jamal's direct appeal to the Pennsylvania Supreme Court.

This case has been heard and considered by several courts throughout a lengthy appeals process. On direct review, the Pennsylvania Supreme Court affirmed the trial court's judgment of conviction and sentence on March 6, 1989. *See Commonwealth v. Abu-Jamal*, 555 A.2d 846 (Pa. 1989). Abu-Jamal presented a *Batson v. Kentucky*, 476 U.S. 79 (1986), argument – the prosecution systematically excluded jurors by race through the use of peremptory challenges – for the first time on his direct appeal to the Pennsylvania Supreme Court. *Abu-Jamal*, 555 A.2d at 849. The court denied rehearing. *See Commonwealth v. Abu-Jamal*, 569 A.2d 915 (Pa. 1990). On October 1, 1990, the United States Supreme Court denied Abu-Jamal's petition for writ of certiorari. *See Abu-Jamal v. Pennsylvania*, 498 U.S. 881 (1990). On November 26, 1990, the United States Supreme Court denied Abu-Jamal's petition for rehearing. *See Abu-Jamal v. Pennsylvania*, 498 U.S. 993 (1990). The Court denied a second request for rehearing on June 10, 1991. *See Abu-Jamal v. Pennsylvania*, 501 U.S. 1214

9

(1991). On June 1, 1995, Pennsylvania Governor Thomas Ridge signed Abu-Jamal's writ of execution, which was to be carried out on August 17, 1995.

Abu-Jamal's new counsel filed a Petition for Stay of Execution, a Petition for Recusal of the post-conviction court, a Petition for Discovery, and a Petition for Post Conviction Relief (PCRA) on June 5, 1995. On June 12, 1995, the Court of Common Pleas of Philadelphia County (PCRA court) denied the petition for recusal, granted the petition for an evidentiary hearing, and held the petition for stay of execution under advisement. Abu-Jamal filed an emergency appeal to the Pennsylvania Supreme Court for recusal of the PCRA court; the court affirmed the denial of recusal. The PCRA court denied the petition for discovery on June 14, 1995. The Pennsylvania Supreme Court later denied reconsideration of the petitions for recusal and discovery.

The PCRA court scheduled the evidentiary hearing to begin on July 18, 1995. The Pennsylvania Supreme Court granted Abu-Jamal's emergency application for temporary stay of the evidentiary hearing and ordered that it commence on July 26, 1995. The PCRA court conducted an evidentiary hearing, which lasted from July 26 to August 15, 1995. The PCRA court granted Abu-Jamal's motion to stay his execution on August 7, 1995. Abu-Jamal presented a *Mills v. Maryland*, 486 U.S. 367 (1988), argument – the jury instructions and verdict form employed in the sentencing phase were constitutionally defective – for the first time on collateral review before the

10

PCRA court. *See Commonwealth v. Abu-Jamal*, No. 1357, 1995 WL 1315980, at *111 (C.P. Ct. Phila. Cty. Sept. 15, 1995) [hereinafter *PCRA Op.*]. On September 15, 1995, the PCRA court denied the petition for post-conviction relief. *See PCRA Op.*, 1995 WL 1315980 at *128.

Abu-Jamal appealed to the Pennsylvania Supreme Court. Abu-Jamal filed a motion for remand for the purpose of taking additional testimony from Veronica Jones, an allegedly newly available witness. The Pennsylvania Supreme Court ordered the matter remanded to the PCRA court for an evidentiary hearing on the claim. The PCRA court held a three-day evidentiary hearing, and on November 1, 1996, denied Abu-Jamal's motion to supplement the record with Jones's testimony on the grounds that she was neither newly available nor credible. *See Commonwealth v. Abu-Jamal*, No. 1357 Jan. Term 1982 (C.P. Ct. Phila. Cty. Nov. 1, 1996).

Abu-Jamal then sought remand to the PCRA court to conduct additional discovery of prosecution and police files in their entirety, to supplement his *Batson* claim based upon a videotape released after his trial, to reassign the matter on remand to a different judge, and to elicit testimony from Pamela Jenkins, a witness who would allegedly support Abu-Jamal's claims of witness coercion and police intimidation. The Pennsylvania Supreme Court denied the motions to conduct additional discovery, to reassign the matter, and to supplement the *Batson* claim, but it did order remand for an evidentiary hearing to take Jenkins's testimony. The PCRA court conducted

11

an evidentiary hearing and on July 24, 1997, denied relief on the ground that Jenkins's testimony was not credible. *See Commonwealth v. Abu-Jamal*, Nos. 1357-58 Jan. Term 1982 (C.P. Ct. Phila. Cty. July 24, 1997).

On October 29, 1998, the Pennsylvania Supreme Court unanimously affirmed the denial of post-conviction relief. *See Commonwealth v. Abu-Jamal*, 720 A.2d 79 (Pa. 1998) [hereinafter *PCRA Appeal Op.*]. The court denied a petition for reconsideration and denied Abu-Jamal's motion for Justice Ronald Castille to recuse himself. On October 4, 1999, the United States Supreme Court denied a petition for writ of certiorari. *Abu-Jamal v. Pennsylvania*, 528 U.S. 810 (1999). Governor Ridge signed a second writ of execution, which was to be carried out on December 2, 1999.

Abu-Jamal filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania on October 15, 1999, raising twenty-nine claims asserting alleged defects in both the guilt and penalty phases of his trial, and errors in post-conviction review. On October 26, 1999, the District Court granted a motion to stay the execution. After extensive briefing by both parties, on December 18, 2001, the District Court, in a 270-page typescript opinion that thoroughly explored all the claims, denied the writ of habeas corpus on all guilt-phase claims, and did not grant a new trial. But the District Court found constitutional error in the penalty-phase *Mills* claim and granted habeas corpus relief on this ground, rendering the additional penalty-phase claims moot. *See*

12

*Abu-Jamal v. Horn*, No. Civ. A. 99-5089, 2001 WL 1609690, at *1 (E.D. Pa. Dec. 18, 2001). The District Court ordered the Commonwealth to conduct a new sentencing hearing or impose a life sentence. *Id.* at *130. The District Court issued a certificate of appealability as to the *Batson* claim. *Id.*

The Commonwealth timely appealed on December 20, 2001, and Abu-Jamal timely cross-appealed on January 16, 2002. Abu-Jamal petitioned for certification of additional issues for appeal. On June 11, 2002, we stayed consideration of this appeal pending the decision of the Pennsylvania Supreme Court on appeal of Abu-Jamal's second PCRA petition. On October 8, 2003, the Pennsylvania Supreme Court affirmed the PCRA court's denial of relief. *See Commonwealth v. Abu-Jamal*, 833 A.2d 719 (Pa. 2003). On April 29, 2004, we issued a subsequent stay pending the outcome of *Beard v. Banks*, 542 U.S. 406 (2004), a relevant case pending before the United States Supreme Court. We lifted the stay on June 29, 2004, after the Court issued its opinion in *Banks*. The United States Supreme Court denied a third petition for a writ of certiorari on May 17, 2004. *See Abu-Jamal v. Pennsylvania*, 541 U.S. 1048 (2004).

On October 19, 2005, we granted the motion to expand the certificate of appealability with regard to two claims: whether Abu-Jamal was denied his constitutional rights due to the prosecution's trial summation and whether Abu-Jamal was denied due process during post-conviction proceedings as a result of alleged judicial bias. We had already agreed to hear

13

appeals on whether the use of peremptory challenges at trial violated *Batson*, and whether the verdict form and jury charge violated *Mills*.[1]

## II.

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), a state prisoner's habeas petition must be denied as to any claim that was "adjudicated on the merits in State court proceedings" unless the adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). Under the "unreasonable application" prong of § 2254(d)(1), "the question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Abu-Jamal filed his petition for a writ of habeas corpus in 1999; accordingly, his claims are subject to AEDPA. *See Weeks v.*

---

[1]A certificate of appealability was granted on claims 14, 16, and 29. The Commonwealth of Pennsylvania appealed the District Court's order granting the petition of habeas corpus on claim 25. A certificate of appealability is not required for the Commonwealth's appeal. Fed. R. App. P. 22(b)(3).

14

*Snyder*, 219 F.3d 245, 256 (3d Cir. 2000).

## III.

As noted, Abu-Jamal, who is black, was convicted and sentenced for the 1981 murder of Officer Faulkner, who was white. While the matter was on direct appeal, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79 (1986).[2] Abu-Jamal contends the prosecutor used peremptory strikes in a racially discriminatory manner during jury selection in violation of *Batson*. To demonstrate racial discrimination in the use of peremptory challenges at the time of Abu-Jamal's trial, a defendant was required to "show a pattern and practice of racial discrimination in jury selection across multiple prosecutions," *Sistrunk v. Vaughn*, 96 F.3d 666, 668 (3d Cir. 1996), under the then-prevailing standard in *Swain v. Alabama*, 380 U.S. 202,

---

[2]The Court in *Batson* held the discriminatory use of peremptory challenges during jury selection in a defendant's trial violates equal protection. *Id.* at 89–93. The Court established a three-part burden shifting framework to guide a trial court's constitutional review of peremptory strikes. *Id.* at 93–98. "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, . . . the trial court must determine whether the defendant has shown purposeful discrimination." *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (citations omitted).

15

223–24 (1965). *Batson* altered the evidentiary burden required to prove purposeful discrimination by eliminating *Swain*'s requirement that a defendant show a prior pattern of discrimination; instead, it permitted a defendant to establish an equal protection violation based on discrimination in his trial alone. *Batson* "applie[s] retroactively to all cases, state or federal, pending on direct review or not yet final" at the time *Batson* was decided, *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), and therefore applies here. More than twenty-five years after the *voir dire*, we undertake a *Batson* analysis in a case where the defendant did not raise a timely objection at trial.

## A.

The Commonwealth contends Abu-Jamal's *Batson* claim is barred because Abu-Jamal did not raise a contemporaneous objection alleging an equal protection violation under *Swain* or otherwise object to the racial composition of the jury. It contends the Supreme Court in *Batson* presupposed a "timely objection to a prosecutor's challenges" before a court may entertain a claim of racial discrimination in jury selection under *Batson*. Furthermore, it maintains Abu-Jamal's failure to raise the *Batson* issue during trial resulted in a trial record that was not sufficiently developed to support an evaluation of the jury selection practice under *Batson*. Abu-Jamal contends this matter is one of state procedural law and not a prerequisite of the federal claim.

We are not aware of any of our prior state habeas corpus

16

cases (28 U.S.C. § 2254) squarely raising the issue of whether a timely or contemporaneous objection is a prerequisite to a *Batson* claim, so we have not yet directly addressed the issue in any of our prior state habeas cases.[3]  On direct appeal of a federal criminal conviction, we found a defendant "waived his objection to the prosecutor's use of her peremptory challenges by failing to make a contemporaneous objection during jury selection." *Gov't of the Virgin Islands v. Forte*, 806 F.2d 73, 75 (3d Cir. 1986), denial of post-conviction relief *rev'd* 865 F.2d 59, 61 (3d Cir. 1989) ("*Batson* equal protection analysis was not triggered [on direct appeal] because Forte had failed to preserve his objections and because we did not find plain error in the trial proceedings.").

Although the Supreme Court has never defined timeliness

---

[3]We have addressed *Batson* claims where it does not appear a timely objection had been made at trial.  *See, e.g.*, *Wilson v. Beard*, 426 F.3d 653 (3d Cir. 2005); *Riley v. Taylor*, 277 F.3d 261 (3d Cir. 2001) (en banc).  But whether a timely objection is a prerequisite to a *Batson* claim, rather than a matter of state procedural default, was not addressed in these cases, and, as noted, we are not aware of the issue being directly presented to the court.  In *Hardcastle v. Horn*, 368 F.3d 246 (3d Cir. 2004), petitioner did not object to the Commonwealth's peremptory challenges during *voir dire*, but following *voir dire* petitioner moved for a mistrial based on the prosecutor's discriminatory use of peremptory challenges.  *Id.* at 251.

17

for a *Batson* claim,[4] the Court in *Batson* "envisioned an

[4]Abu-Jamal contends that the Court in *Ford v. Georgia*, 498 U.S. 411 (1991), "made it very clear" that the timing of a *Batson* claim is a state law procedural matter and not a prerequisite to the constitutional claim. The Court in *Ford*, reviewing a state procedural default argument, "look[ed] to local rules for the law governing the timeliness of [the] constitutional claim," but did not directly consider whether a timely objection was a prerequisite to a successful *Batson* claim. *Id.* at 423. *See also McCrory v. Henderson*, 82 F.3d 1243, 1247 n.4, 1249 (2d Cir. 1996) (recognizing that "the Court has never defined timeliness for a *Batson* claim" despite the fact that, in *Ford*, "the Court found that states retain considerable discretion to fashion their own rules governing timeliness").

In a pretrial motion, Ford objected to the use of peremptory challenges in a racially discriminatory manner. *Ford*, 498 U.S. at 413–14. The state court ruled that, under state law, a *Batson* objection must be raised between jury selection and the swearing of the jury and found Ford's *Batson* claim procedurally barred. *Id.* at 422. The Court recognized the state law requirement as "sensible," but, because the requirement was not firmly established and regularly followed at the time of Ford's trial, it held Ford's *Batson* objection timely. *Id.* at 422–24.

The Court did not discuss, and had no reason to discuss, whether a contemporaneous objection was a prerequisite under *Batson* because Ford had previously raised an objection.

18

objection raised during the jury selection process." *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996). But once a proper objection was made, the Supreme Court in *Batson* left to state courts the "particular procedures to be followed *upon a defendant's timely objection* to a prosecutor's challenges." *Batson*, 476 U.S. at 99 (emphasis added). Even though the Court entrusted to states the specific implementation of the *Batson* holding, the remedies the Court envisioned relied on actions by trial judges during *voir dire*. *See id.* at 99 n.24 ("[W]e express no view on whether it is more appropriate in a particular case, upon a finding of discrimination . . . , for the trial court to discharge the venire and select a new jury . . . , or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire.") (internal citations omitted). In *Batson*, the Court first, as a preliminary matter, found Batson made a timely objection to the prosecutor's use of peremptory challenges, and only then remanded the case to the trial court for evaluation of the facts. *Id.* at 100.

---

Furthermore, the state conceded that the petitioner properly raised a *Swain* claim. *Id.* at 420. Even though the Court noted the "appropriateness in general of looking to local rules," it did not hold that an objection requirement is exclusively a matter of state law. *Id.* at 423. Accordingly, the *Ford* Court had no reason to engage in the contemporaneous objection discussion we consider here.

19

*Batson* permits a party to establish an equal protection violation based on peremptory strikes in a single trial, *id.* at 93–95, and repudiates the *Swain* evidentiary standard, which required proof of discrimination "in case after case," *Swain*, 380 U.S. at 223.[5] Application of *Batson*'s three-part burden-shifting framework requires attention by the trial judge to actions taken during jury selection in the case at hand. To determine whether the prosecutor excluded jurors on the basis of race, the procedure established in *Batson* relies on trial judges to consider "all relevant circumstances" as they occur in the case before it. *Batson*, 476 U.S. at 96. The Court emphasized the trial judge's central role, noting "[w]e have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Id.* at 97.

_____

[5]Despite a reduction in the quantum of proof necessary to establish a claim, "*Batson* did not change the nature of the violation recognized in *Swain*." *Ford*, 498 U.S. at 420. Accordingly, the Supreme Court has held that an objection to jury selection practices alleging an equal protection violation under *Swain* "necessarily states an equal protection violation subject to proof under the *Batson* standard . . . ." *Id.*; *see also Trevino v. Texas*, 503 U.S. 562, 566–67 (1992) (finding defendant in pre-*Batson* criminal case adequately preserved his claim that the state's use of peremptory strikes at his trial violated the Equal Protection Clause).

A *Batson* claim requires a fact-intensive inquiry into the prosecutor's use of peremptory challenges. A timely objection gives the trial judge an opportunity to promptly consider alleged misconduct during jury selection[6] and develop a complete

[6]The value of a prompt determination must not be understated. Peremptory challenges are often based on "subtle, intangible impressions," *McCrory*, 82 F.3d at 1248, and "educated guesses about probabilities based on the limited information available to an attorney about prospective jurors." *United States v. DeJesus*, 347 F.3d 500, 505 (3d Cir. 2003); *see also Hernandez v. New York*, 500 U.S. 352, 360–62 (1991) (plurality opinion) (concluding that prospective jurors' demeanor and hesitancy in answering questions posed by the prosecutor constituted race-neutral grounds for the peremptory challenges). Further, when determining whether the prosecutor's race-neutral explanations are credible, "the best evidence often will be the demeanor of the attorney who exercises the challenge." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Although evaluations based on demeanor and credibility "lie[] peculiarly within a trial judge's province," *id.*, an untimely objection meaningfully hinders the judge's ability to make accurate rulings. *See McCrory*, 82 F.3d at 1248 ("It is nearly impossible for the judge to rule on [*Batson*] objections intelligently unless the challenged juror either is still before the court or was very recently observed."); *Wilkerson v. Collins*, 950 F.2d 1054, 1063 (5th Cir. 1992) ("The inquiry is essentially one of fact, dependent on credibility, and the passage of time would

21

record.[7]  In addition, when a timely objection is made during

---

diminish the prosecutor's reconstruction of his reasons for striking a venireperson and the judge's evaluation of the juror." (citations omitted)).

[7]In *Galarza v. Keane*, the dissent noted in a different context:
> In addition to allowing the trial court to act in the first instance, potentially correcting the error . . . , timely objection provides a record from which appellate courts can better assess the trial court's reasoning, discourages sandbagging and strategic behavior by trial counsel, and provides the prevailing party with notice of the objector's claims of error . . . . *Batson* plainly necessitates some form of objection: without some objection, the tripartite, burden-shifting framework established by the Court would never be triggered.

252 F.3d 630, 641–42 (2d Cir. 2001) (Walker, C.J., dissenting).

Additionally, in the related context of 28 U.S.C. § 2254(e)(2), Congress has expressed a strong preference for factual development in state court proceedings. The purpose of § 2254(e)(2) is "to ensure the prisoner undertakes his own diligent search for evidence." *Williams v. Taylor*, 529 U.S. 420, 435 (2000). "Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Taylor v. Horn*, 504 F.3d 416, 437 (3d Cir. 2007) (quoting *Williams*,

22

*voir dire*, the trial judge has the opportunity to remedy any defects.[8]  *McCrory*, 82 F.3d at 1247 (noting that a timely objection allows an error to be remedied in "a number of ways" including disallowing the challenge, adding additional jurors to the venire, or "begin[ning] anew with a fresh panel").  Even before *Batson*, a timely objection of racial bias involving jury composition would have alerted the judge to errors that might be corrected in the first instance and given the judge the opportunity to develop a complete record of the jury selection process for appellate review.

The most recent guidance from the Supreme Court on *Batson* comes from *Snyder v. Louisiana*, No. 06-10119, 2008 WL 723750 (Mar. 19, 2008), a state capital murder case. Snyder "center[ed] his *Batson* claim on the prosecution's strikes of two black jurors."  *Id.* at *4.  During *voir dire*, he timely objected to the prosecution's use of peremptory challenges against both jurors.  The trial court preserved important venire

---

529 U.S. at 437).  Abu-Jamal's failure to timely object, coupled with his failure to elicit the trial prosecutor's testimony during a PCRA evidentiary hearing, leaves a scant record in support of his *Batson* claim.

[8]Racial discrimination during *voir dire* harms not only the defendant, but also the excluded juror as well.  *Batson*, 476 U.S. at 87.  If a timely objection is not made during jury selection, the harm to the venireperson cannot be addressed by the court.

23

information. *Id.* at *3 ("Eighty-five prospective jurors were questioned as members of a panel. Thirty-six of these survived challenges for cause; 5 of the 36 were black; and all 5 of the prospective black jurors were eliminated by the prosecution through the use of peremptory strikes."). The Supreme Court concluded that "[b]ecause we find that the trial court committed clear error in overruling petitioner's *Batson* objection with respect to [the first juror], we have no need to consider petitioner's claim regarding [the second juror]." *Id.* at *4. Although the Court focused on the third step of *Batson*, it emphasized the trial court's "pivotal role in evaluating *Batson* claims." *Id.* It acknowledged that a *Batson* inquiry

> involves an evaluation of the prosecutor's credibility and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.

*Id.* (citations and quotations omitted). The Court further

24

"recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province" and noted the deference accorded to the trial court. *Id.* (citations and quotations omitted).

Other courts of appeals in state habeas corpus cases have found a failure to timely object bars consideration of a *Batson* claim.[9] The Court of Appeals for the Fifth Circuit held "[t]he

_____

[9]In other contexts, several courts of appeals have held similarly. *See Morning v. Zapata Protein (USA), Inc.*, 128 F.3d 213, 216 (4th Cir. 1997) (holding, in a personal injury case, "that a *Batson* challenge raised after the venire has been excused has been raised too late"); *United States v. Parham*, 16 F.3d 844, 847 (8th Cir. 1994) (holding, on a direct appeal from a federal conviction, "a *Batson* objection must be made at the latest before the venire is dismissed and before the trial commences"); *United States v. Maseratti*, 1 F.3d 330, 335 (5th Cir. 1993) (stating, on a direct appeal from a federal conviction, "that to be timely, the *Batson* objection must be made before the venire is dismissed and before the trial commences" (quoting *United States v. Romero-Reyna*, 867 F.2d 834, 837 (5th Cir. 1989))); *United States v. Cashwell*, 950 F.2d 699, 704 (11th Cir. 1992) (stating, on a direct appeal from a federal conviction, "[t]he failure to make a timely *Batson* objection results in a waiver of the claim"); *Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 534 (9th Cir. 1991) (stating, in a wrongful discharge and intentional infliction of severe emotional distress case, "that *Batson* objections must

25

evidentiary rule established in *Batson* does not enter the analysis of a defendant's equal protection claim unless a timely objection is made to the prosecutor's use of his peremptory challenges." *Thomas v. Moore*, 866 F.2d 803, 804 (5th Cir. 1989); *see also McCrory*, 82 F.3d at 1249 ("[W]e hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection."); *Sledd v. McKune*, 71 F.3d 797, 799 (10th Cir. 1995) (concluding there was no basis to review a peremptory challenge when an objection had not been made in the state trial court). In *Thomas*, the court found it did not need to entertain the state's contention that Thomas's *Batson* claim was barred by a state contemporaneous objection rule because "[a] timely objection . . . is requisite to a *Batson* claim." *Thomas*, 866 F.2d at 804; *see also Allen v. Lee*, 366 F.3d 319, 327–28 (4th Cir. 2004) (en banc) (concluding the defendant "did not adequately preserve his *Batson* objection . . . [by remaining silent] after the trial judge's repeated calls for objections after the actual jury selection" and emphasizing the defendant's claim had not been procedurally defaulted); *Wilkerson v. Collins*, 950 F.2d 1054, 1063 (5th Cir. 1992).

Abu-Jamal did not object to the prosecutor's use of peremptory challenges at any point during *voir dire* or at his

occur as soon as possible, preferably before the jury is sworn").

26

1982 trial.[10]  Abu-Jamal first raised the argument that the prosecutor used peremptory strikes in a racially discriminatory manner on direct appeal to the Pennsylvania Supreme Court, which issued its opinion in 1989.  *See Abu-Jamal*, 555 A.2d at 849 (finding Abu-Jamal had waived any *Batson* claim because

---

[10] Our dissenting colleague points to a March 18, 1982 pre-trial motion as evidence that Abu-Jamal arguably presented an objection before trial under the then-prevailing *Swain* standard.  But the record demonstrates that Abu-Jamal filed a motion seeking to distribute questionnaires to all prospective jurors prior to their scheduled date for jury service.  Transcript of March 18, 1982, at 11.  The questionnaires would "not indicate that the case involves Mr. Jamal" and would be a "general survey" with questions about potential venirepersons' backgrounds and locations of residence.  Transcript of March 18, 1982, at 14–18.  Abu-Jamal's counsel hoped that such a survey would assist his selection of a fair and impartial jury because "in addition to the questionnaire I will have the opportunity to send people to the neighborhood . . . , to check to see how they live, what are their relationships to the criminal justice system and what hidden hostilities they have in the hidden recesses of their subconscious mind, what their childhood problems were that might allow them to be triggered by something in the courtroom."  Transcript of March 18, 1982, at 13, 18.  Abu-Jamal's motion to distribute a questionnaire to all prospective jurors is different from lodging a timely objection during the jury selection process.

27

"[n]ot only did he fail to advance the issue in any form resembling that adopted by the Supreme Court in *Batson*, he made no attempt even to frame the issue under the then prevailing rules of *Swain v. Alabama*," but also addressing the merits, stating: "it may be appropriate to relax application of the waiver rule" in a death penalty case).  As noted, there are also prudential reasons for requiring a timely objection at trial to preserve a *Batson*-type claim for appellate review.  Although none of our prior cases have directly confronted or ruled on this issue,[11] we believe a timely objection is required to preserve this

---

[11]We have, however, recognized the evidentiary problems that occur when a timely objection has not been made.  *See Hardcastle v. Horn*, 368 F.3d 246, 255 (3d Cir. 2004) ("[R]etroactive application of *Batson* causes unique evidentiary problems for reviewing courts, as the three-step *Batson* inquiry . . . did not occur during *voir dire* in these cases."); *Deputy v. Taylor*, 19 F.3d 1485, 1492 (3d Cir. 1994) ("Because we assume *Batson*'s application, we need not decide this question [whether *Batson* applies to cases where an objection to jury selection had not been made in the criminal case itself, but] . . . [n]evertheless, argument on delay is not without all force.").

In *Uttecht v. Brown*, 127 S. Ct. 2218 (2007), assessing a state trial court's removal of a juror for cause, the Court did not consider inconsequential a defendant's failure to make a timely objection when evaluating jury selection procedures at trial.  *Id.* at 2229 ("By failing to object, the defense did not just deny the conscientious trial judge an opportunity to explain his judgment

28

issue on appeal. Accordingly, Abu-Jamal has forfeited his *Batson* claim by failing to make a timely objection. But, even assuming Abu-Jamal's failure to object is not fatal to his claim, Abu-Jamal has failed to meet his burden in proving a prima facie case.

**B.**

Before we address the merits of the *Batson* claim, we must first consider procedural default. Besides the argument that *Batson* requires a contemporaneous objection at trial, the Commonwealth contends Abu-Jamal's failure to raise an objection to jury selection before trial renders it procedurally defaulted for purposes of habeas review. As noted, Abu-Jamal first raised the *Batson* claim on direct appeal to the Pennsylvania Supreme Court. *See Abu-Jamal*, 555 A.2d at 849.

On direct appeal, the Pennsylvania Supreme Court found Abu-Jamal had waived any *Batson* claim because he had not made an objection, in any form, during *voir dire* or at trial to the prosecutor's use of peremptory challenges. *Id.* The court stated:

> There can be no doubt that under the longstanding teaching of *Commonwealth v. Clair*, 326 A.2d 272 (Pa. 1974), the appellant has waived any

or correct any error. It also deprived reviewing courts of further factual findings that would have helped to explain the trial court's decision."). The Court recognized the defendant's failure to object as a factor to consider in its analysis. *Id.*

29

claim that the prosecutor engaged in discriminatory use of peremptory challenges to obtain an unrepresentative jury. Not only did he fail to advance the issue in any form resembling that adopted by the Supreme Court in *Batson*, he made no attempt even to frame the issue under the then prevailing rules of *Swain v. Alabama*, 380 U.S. 202 (1965).

*Id.* But the court then said:

We have, at times, indicated that because of the extreme, indeed irreversible, nature of the death penalty, it may be appropriate to relax application of the waiver rule and address the merits of arguments raised for the first time in the direct appeal to this Court. In other capital cases, however, we have held that certain issues were waived for failure to raise them before the trial court. In light of this, the Commonwealth has argued in the alternative – waived or not, the appellant's claim of improper use of peremptories is without merit.

*Id.* (citation omitted). Without stating whether it was relaxing the waiver rule or not, the court proceeded to discuss the merits

30

of Abu-Jamal's *Batson* claim and deny relief.[12]

On collateral review, the PCRA court recognized the Pennsylvania Supreme Court's discussion on the merits as an "alternative resolution" of the *Batson* claim. *PCRA Op.*, 1995 WL 1315980, at *103. Nonetheless, it concluded that the claim

---

[12]In a subsequent discussion regarding Abu-Jamal's challenge to statements made during the prosecutor's closing argument, the court stated:

> It must be acknowledged that were this not a capital case, this claim of error would be summarily dismissed as having been waived. No objection was made at the time of trial, the issue was not addressed in post-verdict motions, and appellate counsel has not claimed that trial counsel's ineffective assistance in this regard is a special circumstance justifying appellate review despite the waiver. Nevertheless, we will address it on the merits in light of "relaxation" of the waiver rule previously noted as being appropriate in capital cases.

*Id.* at 854.

Pennsylvania state courts have since disavowed application of the relaxed waiver rule, but, at the time of Abu-Jamal's state appeals, an "unforgiving waiver rule was not consistently and regularly applied." *Albrecht v. Horn*, 485 F.3d 103, 116 (3d Cir. 2007) (internal quotations omitted).

was not subject to further review under 42 Pa. Cons. Stat. § 9544(a) because it had been previously litigated on the merits.[13] *Id.* at *102. Further, the PCRA court readdressed the merits of the *Batson* claim after the Commonwealth withdrew a previous objection to the introduction of new evidence and a stipulation was admitted. The PCRA court concluded that "to the extent the instant claim was cognizable, it was [Abu-Jamal's] burden to prove that the [Pennsylvania Supreme Court's] analysis was in some respect incorrect. This, he fails to do." *Id.* at *104.

On appeal of the denial of state collateral relief (PCRA), Abu-Jamal challenged the previous *Batson* rulings on ineffective assistance of counsel grounds as well as on the merits. The Pennsylvania Supreme Court found that Abu-

---

[13]The PCRA court likely relied on 42 Pa. Cons. Stat. § 9544(a) ("[A]n issue has been previously litigated if: . . . (2) the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue . . . .") rather than § 9544(b) ("[A]n issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding.") because it applied the relaxed waiver rule throughout the opinion. *See PCRA Op.*, 1995 WL 1315980, at *70 n.28 ("Since the instant matter resulted in a sentence of death, this Court will relax the waiver rule and make findings and conclusions based on the merits of each issue presented.").

32

Jamal's

> argument as to the specific instances [of ineffective assistance] is largely redundant as he has elsewhere in this appeal raised the underlying merits respecting each of those instances and therein also included a claim of counsel's ineffectiveness. Accordingly, as this court has found no merit to any of those underlying claims, we need not, at this point, again individually analyze the claims since there can be no finding of ineffectiveness where the underlying claim lacks merit.

*PCRA Appeal Op.*, 720 A.2d at 108.[14] The court implied that it first addressed the claims on the merits, then denied relief on the specific claims of ineffective assistance due to lack of merit. When addressing Abu-Jamal's *Batson* claim the court did not explain whether it was addressing the claim directly or through

---

[14]Under Pennsylvania law, to obtain relief on a claim of ineffective assistance of counsel, Abu-Jamal was required to demonstrate that: "(1) the underlying substantive claim has arguable merit; (2) counsel whose effectiveness is being challenged did not have a reasonable basis for his or her actions or failure to act; and (3) the petitioner suffered prejudice as a result of that counsel's deficient performance." *Commonwealth v. McGill*, 832 A.2d 1014, 1020 (Pa. 2003); *see also Commonwealth v. LaCava*, 666 A.2d 221, 229 (Pa. 1995).

33

the lens of ineffective assistance of counsel. The court ultimately denied relief, concluding that, on the merits, "we would still arrive at the same resolution of this issue that we did on direct appeal." *Id.* at 114.

A federal habeas court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Lambrix v. Singletary*, 520 U.S. 518, 522 (1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). A state procedural rule provides an independent and adequate basis for precluding federal review if "(1) the state procedural rule speaks in unmistakable terms; (2) all state appellate courts refused to review the petitioner's claims on the merits; and (3) the state courts' refusal in this instance is consistent with other decisions." *Doctor v. Walters*, 96 F.3d 675, 683–84 (3d Cir. 1996).

As noted, for a claim to be procedurally defaulted, "all state appellate courts [must have] refused to review the petitioner's claims on the merits . . . ." *Albrecht*, 485 F.3d at 115 (internal quotations omitted). "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)) (internal citations omitted); *see also Smith v. Freeman*,

892 F.2d 331, 337 (3d Cir. 1989) ("[W]e are not bound to enforce a state procedural rule when the state itself has not done so, even if the procedural rule is theoretically applicable to our facts."). Our review is "foreclosed when the state court addresses the merits of the federal claim only in the course of resolving another, independent [ineffective assistance of counsel] claim." *Sistrunk v. Vaughn*, 96 F.3d 666, 675 (3d Cir. 1996).

The Pennsylvania Supreme Court, in its review of the PCRA court, did not clearly and expressly make a finding of procedural default or waiver with respect to the *Batson* claim. The court only discussed waiver with respect to those claims not raised on direct appeal. *See PCRA Appeal Op.,* 720 A.2d at 88 n.9 (finding the relaxed waiver doctrine has no applicability to claims not raised on direct appeal). Further, the Supreme Court did not clearly state whether it was addressing the merits of the *Batson* claim in the course of resolving the ineffective assistance of counsel claim. Nor did the Supreme Court identify which claims, if any, it would address only as ineffective assistance of counsel claims. *Id.* at 113–14. Without a clear and express statement that the state court denied relief on independent state procedural grounds, we cannot find the claim procedurally defaulted.[15]

---

[15] In a recent case, we came to the same conclusion through a related analysis. *See Holland v. Horn*, Nos. 01-9001 & 01-9002, 2008 WL 607486 (3d Cir. Mar. 6, 2008). "'The

procedural default doctrine precludes a federal habeas court from reviewing a question of federal law decided by a state court if the decision of that court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment.'" *Id.* at *2 (quoting *Bronshtein v. Horn*, 404 F.3d 700, 707 (3d Cir. 2005)). "[T]he state rule must have been announced prior to its application in the petitioner's case and must have been 'firmly established and regularly followed.'" *Fahy v. Horn*, Nos. 03-9008 & 03-9009, 2008 WL 191643, at *9 (3d Cir. Jan. 24, 2008) (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)); *see also Holland*, 2008 WL 607486, at *2 ("[S]tate procedural rules have been held to be inadequate if they are not 'firmly established and regularly followed' . . . ." (quoting *Bronshtein*, 404 F.3d at 707)).

Although the Pennsylvania Supreme Court later abrogated the relaxed waiver rule, *Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998), at the time of Abu-Jamal's "purported waiver the Court's practice was to address all issues arising in a death penalty case even if the issue had been waived." *Fahy*, 2008 WL 191643, at *10. *See also Holland*, 2008 WL 607486, at *5 ("It is clear there was not a firmly established and regularly followed Pennsylvania procedure governing the presentation of relief from death sentences . . . ."). Since an "unforgiving waiver rule was not consistently and regularly applied" during Abu-Jamal's trial, direct appeals, or post-conviction appeals, the state law procedural grounds are not an adequate basis to

36

## C.

During *voir dire*, the prosecution exercised fifteen out of its twenty available peremptory challenges and removed ten black potential jurors from the venire. Abu-Jamal did not object to any of the peremptory challenges. Abu-Jamal struck at least one black juror that had been accepted by the prosecution. At the close of jury selection, the jury was composed of nine white jurors and three black jurors. The court later dismissed one of these black jurors, for unrelated reasons, after the trial began. The final empaneled jury consisted of ten white jurors and two black jurors. The record does not reveal the total number of venirepersons or the racial composition of the venire.

We now consider the merits of Abu-Jamal's *Batson* claim. As noted, we are guided by 28 U.S.C. § 2254(d)(1), which instructs us to determine whether the Pennsylvania Supreme Court's decision was contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007); *Williams v. Taylor*, 529 U.S. 362, 405–06, 410–13 (2000). Abu-Jamal contends the prosecutor's use of peremptory strikes at trial violated his equal protection rights under *Batson*, and maintains the record establishes a "pattern" of discrimination that gives rise to an inference of discrimination. In *Batson*, the

---

support the judgment and cannot be a ground for procedural default. *Albrecht*, 485 F.3d at 116. Accordingly, Abu-Jamal has not procedurally defaulted his claim.

37

Supreme Court established a three-part burden-shifting framework for determining the constitutionality of peremptory challenges. 476 U.S. at 96–98. First, the defendant must establish a prima facie case of purposeful discrimination. Second, if a prima facie case is found, the prosecution must articulate a race-neutral justification for the challenged strikes. Third, after considering both parties' submissions, the trial court must determine whether the defendant has established purposeful discrimination. *Id.*; *see also Miller-El*, 537 U.S. at 328–29.

> To establish a prima facie case,
>
>> the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.

*Batson*, 476 U.S. at 96 (quotations and citations omitted). A prima facie case will be found if, after considering these facts and all relevant circumstances, the "evidence [is] sufficient to permit the trial judge to draw an inference that discrimination has occurred" in the prosecutor's exercise of peremptory

38

challenges. *Johnson v. California*, 545 U.S. 162, 170 (2005). In *Batson*, the Court provided two examples of "relevant circumstances" courts could consider in deciding whether a defendant has established a prima facie case: (1) "a 'pattern' of strikes against black jurors included in the particular venire"; and (2) "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges."[16] 476 U.S. at 97. The Supreme Court clarified in *Johnson* that the Court

> did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.

---

[16]In *United States v. Clemons*, 843 F.2d 741 (3d Cir. 1988), a federal criminal case on direct review, we noted "[w]hen assessing the existence of a prima facie case, trial judges should examine all relevant factors, such as: how many members of the 'cognizable racial group' . . . are in the [venire] panel; the nature of the crime; and the race of the defendant and the victim," in addition to the two factors specifically mentioned in *Batson*. *Id.* at 748; *see also Deputy*, 19 F.3d at 1492 (noting one of the factors a trial court should consider when determining whether a defendant has presented a prima facie *Batson* issue is "how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen").

39

545 U.S. at 170.

**D.**

Abu-Jamal first raised a *Batson* claim on direct appeal, contending the prosecution improperly used peremptory challenges at his trial. *Abu-Jamal*, 555 A.2d at 848. The Pennsylvania Supreme Court, addressing the *Batson* claim, found Abu-Jamal had not established a prima facie case. *Id.* at 850. The court held "that mere disparity of number in the racial make-up of the jury, though relevant, is inadequate to establish a prima facie case." *Id.* Additionally, the court found there was no pattern in the prosecutor's use of peremptory challenges based on factual findings that the Commonwealth used fifteen of twenty available peremptory challenges to remove eight black potential jurors. *Id.* The court also examined the prosecutor's statements and comments during *voir dire* and found "not a trace of support for an inference that the use of peremptories was racially motivated." *Id.* The Pennsylvania Supreme Court did not make any findings as to the racial composition of the entire venire.

The PCRA court found the "Commonwealth did not intentionally or racially discriminate against African-American jurors in its use of peremptory strikes in violation of *Batson* and its progeny." *PCRA Op.*, 1995 WL 1315980, at *102. On review of the PCRA court's denial of post-conviction relief, the Pennsylvania Supreme Court reiterated its finding that Abu-Jamal had not established a prima facie case. *PCRA Appeal*

40

*Op.*, 720 A.2d at 114. Even though the *Batson* issue had been addressed on direct appeal, the court reconsidered the issue in light of a stipulation by both parties that the prosecution had used peremptory challenges to remove ten rather than eight black venirepersons. The court found "[e]ven assuming . . . [this stipulation], we would still arrive at the same resolution of this issue that we did on direct appeal . . . [that a]ppellant's current claim . . . warrants no relief." *Id.*

The District Court did not find objectively unreasonable the Pennsylvania Supreme Court's determination that Abu-Jamal had not established a prima facie case. *Abu-Jamal*, 2001 WL 1609690, at *107. The District Court noted four missing pieces of evidence often used when evaluating whether a defendant had established a prima facie case: (1) the racial composition of those jurors dismissed by the defendant; (2) the total number of jurors in the venire; (3) the racial composition of the entire venire; and (4) the number and race of those dismissed for cause. *Id.* at *106. In addition, the District Court found Abu-Jamal had not pointed to any improper statements or questions by the prosecution during *voir dire*. *Id.* After reviewing the state court's factual findings, the District Court found the AEDPA standard requires deference to these factual findings and the state supreme court's ruling. *Id.* at *107. The District Court found "federal law as set forth in *Batson* does not require" an outcome contrary to the state court's holding that Abu-Jamal failed to establish a prima facie case. *Id.*

The Pennsylvania Supreme Court concluded Abu-Jamal

41

had not established a prima facie case. Accordingly, we need only review this first step of the *Batson* standard to determine whether the Pennsylvania Supreme Court's conclusion was an unreasonable application of clearly established federal law as determined by the United States Supreme Court. We begin with *Batson*, which provides that a "pattern" of discrimination is one relevant factor that may give rise to a prima facie case. *Batson*, 476 U.S. at 97. The Court in *Batson* did not articulate the evidence necessary to demonstrate a pattern, except to note, "[i]n cases involving the venire, this Court has found a prima facie case on proof that members of the defendant's race were substantially underrepresented in the venire from which the jury was drawn . . . ." *Id.* at 94 (citing *Whitus v. Georgia*, 385 U.S. 545, 552 (1967)). In *Batson*, the Court found the prosecutor's use of his peremptory challenges to remove all four black members of the venire raised an inference of discrimination. *Id.* at 100; *see also Johnson*, 545 U.S. at 169–70.

The Supreme Court has found prima facie *Batson* cases based on a pattern of discrimination, but only where the trial record has indicated both the strike rate and the racial composition of the venire. The strike rate is computed by comparing the number of peremptory strikes the prosecutor used to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised. This statistical computation differs from the "exclusion rate," which is calculated by comparing the percentage of exercised challenges used against black potential jurors with the percentage of black

42

potential jurors known to be in the venire. *See Overton v. Newton*, 295 F.3d 270, 278 n.9 (2d Cir. 2002) (discussing the use of this evidence to determine statistical disparities in jury selection processes).

In *Miller-El v. Cockrell*, on which Abu-Jamal relies to demonstrate a pattern of discrimination, the Supreme Court evaluated the prosecution's jury selection procedures in considering whether the Court of Appeals for the Fifth Circuit erred in not granting a certificate of appealability. *Miller-El*, 537 U.S. at 331. The Court found "statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors." *Id.* at 342. But in reaching this conclusion regarding the statistical evidence, the Court considered evidence that "[t]he prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members . . . [and i]n total, 10 of the prosecutors' 14 peremptory strikes were used against African-Americans." *Id.* In reaching this conclusion regarding the statistical evidence, the Court in *Miller-El* relied upon both the strike rate and the exclusion rate. Similarly, in *Johnson*, the Court considered evidence that the prosecution used three of twelve peremptory challenges to remove all three black prospective jurors in the venire. 545 U.S. at 164, 173; *see also People v. Johnson*, 71 P.3d 270, 272 (Cal. 2003). In both cases, the Court relied upon evidence of the racial composition of the venire. Neither case addresses a situation in which the strike rate and the exclusion rate are unknown. *Cf. Schriro*, 127 S. Ct.

43

at 1942 (finding that the state court's conclusion was not objectively unreasonable because the Supreme Court had "never addressed a situation like this").

Some courts of appeals have noted the significance of considering the prosecution's strike rate in relation to the racial composition of the venire when evaluating whether a party has established a prima facie case under *Batson*. The Court of Appeals for the Eleventh Circuit in *United States v. Ochoa-Vasquez*, 428 F.3d 1015 (11th Cir. 2005), found "[w]hile statistical evidence may support an inference of discrimination, it can do so only when placed in context. For example, the number of persons struck takes on meaning *only* when coupled with other information such as the racial composition of the venire . . . ." *Id.* at 1044 (internal citations omitted). The court upheld the district court's finding that the defendant had not established a prima facie case based on a pattern of discrimination where the prosecution used five out of nine peremptory challenges to remove Hispanic potential jurors, in part because the prosecution's strike rate was proportional to the composition of the venire, and in part because the prosecution also selected six Hispanics to serve on the jury. *Id.* at 1044, 1047.

In *Medellin v. Dretke*, 371 F.3d 270 (5th Cir. 2004), the Court of Appeals for the Fifth Circuit denied a certificate of appealability for a *Batson* claim on the ground that the number of peremptory strikes alone is insufficient to establish a prima facie case without evidence of the racial composition of the

44

entire venire. *Id.* at 278–79; *see also Sorto v. Herbert*, 497 F.3d 163, 171 (2d Cir. 2007) ("When, as here, a *Batson* prima facie case depends on a pattern of strikes, a petitioner cannot establish that the state court unreasonably concluded that the pattern was not sufficiently suspicious unless the petitioner can adduce a record of the baseline factual circumstances attending the *Batson* challenge . . . [, which] would likely include evidence such as the composition of the venire . . . . 'Whether [a strike] rate creates a statistical disparity would require knowing the minority percentage of the venire . . . .'" (quoting *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991)) (emphasis in original omitted)); *Walker v. Girdich*, 410 F.3d 120, 123 (2d Cir. 2005) (finding a prima facie case had not been established based on a pattern of discrimination where the prosecutor used twelve out of thirteen peremptory strikes against black members of the venire because the record did not indicate the racial composition of the entire venire); *United States v. Esparsen*, 930 F.2d 1461, 1467 (10th Cir. 1991) ("By itself, the number of challenges used against members of a particular race is not sufficient to establish or negate a prima facie case . . . . In this case, for instance, the prosecution's use of 71% (5/7) of its challenges against Hispanics would acquire some statistical meaning if we knew the percentage of Hispanics in the venire.") (internal quotations omitted). In *Medellin*, the prosecution used six out of thirteen strikes to remove black members of the venire; the defendant did not provide any additional evidence to support his prima facie case. 371 F.3d at 278. The Court of Appeals for the Fifth Circuit held:

> For the statistical evidence to be relevant, data
> concerning the entire jury pool is necessary.  The
> number of strikes used to excuse minority and
> male jury pool members is irrelevant on its own.
> Indeed, depending on the make-up of the jury
> pool, such numbers could indicate that the state
> discriminated against Anglos and females.

*Id.* at 278–79.

Here, Abu-Jamal contends the record facts demonstrate a "pattern of strikes against black jurors" in the venire.[17]  Under *Batson*'s first step, Abu-Jamal has the burden to develop a record sufficient to establish a pattern of discrimination that gives rise to an inference of discrimination.  The record shows the prosecution used ten peremptory strikes to remove black venirepersons from the petit jury out of a total of fifteen peremptory strikes exercised, resulting in a strike rate of

---

[17]Abu-Jamal makes other allegations to support his prima facie case, including: (1) Abu-Jamal is black and Faulkner was white; (2) Abu-Jamal is black and the prosecutor exercised peremptory strikes to remove black potential jurors; (3) Faulkner was a police officer, as were key witnesses; (4) the prosecutor's questions and statements during *voir dire*; and (5) a culture of discrimination in the Philadelphia District Attorney's Office. Abu-Jamal has not demonstrated that these allegations make the Pennsylvania Supreme Court's decision objectively unreasonable.

46

66.67%.  *See PCRA Op.*, 1995 WL 1315980, at *103.

There is no factual finding at any level of adjudication, nor evidence from which to determine the racial composition or total number of the entire venire—facts that would permit the computation of the exclusion rate and would provide important contextual markers to evaluate the strike rate.[18]  *See Deputy*, 19 F.3d at 1492 (finding defendant had not established a prima facie case because of undeveloped record, including failure to present evidence on the venire's racial composition, caused by delay in raising *Batson* claim).  As noted, *Batson* was decided in April 1986, after the trial.  Abu-Jamal first raised a *Batson* claim on direct appeal to the Pennsylvania Supreme Court, which rejected it in a 1989 decision.  At the 1995 PCRA evidentiary hearing, which occurred nine years after *Batson* was decided, Abu-Jamal had the trial prosecutor under subpoena and had the opportunity to call him to testify.  But Abu-Jamal did not take this action.  At the first *Batson* step, it was Abu-Jamal's burden to establish a prima facie case, and the trial prosecutor's testimony might have provided relevant evidence to support a

---

[18]Abu-Jamal contends the prosecutor had the opportunity to strike thirty-nine venirepersons, of which fourteen were allegedly black, but he does not cite any record support for these numbers.  We see no record support for these numbers.

47

prima facie case.[19]

Under AEDPA's deferential standard of review, the record is fatally deficient to support a successful challenge to the Pennsylvania Supreme Court's decision finding no prima facie case under *Batson*. As noted, the record does not include evidence of the number or racial composition of the venire.[20] Without this evidence, we are unable to determine whether there

---

[19]Abu-Jamal's failure to take the opportunity to elicit the prosecutor's testimony is noteworthy considering the absence of a developed record to support a prima facie case.

[20]In *Clemons*, a federal criminal case on direct appeal, we noted the number of racial group members in the venire is a relevant factor a trial judge could consider when assessing a prima facie case. But we did not bar trial judges from considering other circumstances, noting that although "[s]ituations may arise where trial judges find it relevant to examine other factors, such as the percentage of the 'cognizable racial group' in the jury pool, or the racial composition of the district . . . , [w]e do not envision such inquiries as mandatory." *Clemons*, 843 F.2d at 748 n.5. In *Clemons*, the record established the prosecutor had used "peremptory challenges to strike the only two blacks on the jury panel." *Id.* at 742. In contrast, the record here does not establish the number of black potential jurors in the venire. We are unable to determine a statistical disparity here without this evidence.

is a disparity between the percentage of peremptory strikes exercised to remove black venirepersons and the percentage of black jurors in the venire.  Abu-Jamal had the opportunity to develop this evidence at the PCRA evidentiary hearing, but failed to do so.  There may be instances where a prima facie case can be made without evidence of the strike rate and exclusion rate.  But in this case, we cannot find the Pennsylvania Supreme Court's ruling unreasonable based on this incomplete record.

Although we have cited the importance of the venire's racial composition, *see, e.g.*, *Clemons*, 843 F.2d at 748; *Deputy*, 19 F.3d at 1492, we have previously found prima facie *Batson* claims established without this record evidence.[21]  But we

---

[21]Abu-Jamal cites *Holloway v. Horn*, 355 F.3d 707, 729–30 (3d Cir. 2004), for support.  But *Holloway* is inapplicable to this case because it did not apply the deferential standards provided by AEDPA § 2254(d).  In *Holloway*, the court found that the state court "plainly did not render an 'adjudication on the merits' of [Petitioner's *Batson*] claim for purposes of applying the AEDPA standards." *Id.* at 719.  As a result, instead of applying AEDPA's deferential standard of review, the court applied pre-AEDPA standards and reviewed the legal conclusions of the state courts *de novo*. *Id.*  Because the court held that § 2254(d) did not apply, the court's alternative conclusions under AEDPA, *see id.* at 729–30, are dicta.

Additionally, *Holloway* is distinguishable on the facts.  In *Holloway*, we found a prima facie case based primarily on the

49

believe those cases can be distinguished on their facts. Even where we have found a pattern of discrimination sufficient to establish a prima facie case under *Batson*, the prosecution had used a greater percentage of its strikes to remove black potential jurors from the venire than the percentage we find in the record here. As noted, here the prosecution used ten of fifteen peremptory strikes against black potential jurors. We have never found a prima facie case based on similar facts.

In *Brinson v. Vaughn*, 398 F.3d 225 (3d Cir. 2005), we found a prima facie showing based on the strike rate alone, where the prosecution had used thirteen of fourteen peremptory

---

prosecution's pattern of strikes. *Id.* at 722. The record demonstrated that "Holloway moved for a mistrial after the prosecutor had used seven of eight peremptory strikes against African-Americans; the Commonwealth ultimately used eleven of twelve strikes in that manner." *Id.* We also considered in *Holloway* the difference in race of the officer who took Holloway's custodial statement, who was white and on whose testimony and perceived credibility "Holloway's defense would rise or fall," and the defendant and victim, both black. *Holloway*, 355 F.3d at 723.

In *Hardcastle*, unlike in this case, the exclusion rate was known. 368 F.3d at 251 ("During the course of jury selection at his trial, the prosecutor used her peremptory strikes, of which she had a total of twenty, to remove twelve of the fourteen African-American members of the venire.").

50

challenges to remove black venirepersons. Although we found the high strike rate sufficient to establish a prima facie case in *Brinson*, we noted that the racial composition of the venire, if composed almost entirely of black venirepersons, could "provide an innocent explanation" that would weigh against finding a pattern of discrimination. *Id.* at 235.[22]

At issue is whether the Pennsylvania Supreme Court unreasonably applied Supreme Court precedent. Our standard on collateral review is whether the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). AEDPA creates "an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings," and we are guided by the statute's "binding[] directions to accord deference." *Uttecht*, 127 S. Ct. at 2224; *see also* 28 U.S.C. § 2254(d); *Schriro*, 127 S. Ct. at 1939; *Williams*, 529 U.S. at 413. The Pennsylvania Supreme Court addressed the *Batson* claim on the merits, *see*

---

[22]Abu-Jamal relies on *Simmons v. Beyer*, 44 F.3d 1160 (3d Cir. 1995), to support his prima facie showing. But *Simmons* is inapposite here. *Simmons* involved a *Batson* claim intertwined with a speedy trial claim after a thirteen-year "egregious delay" between Simmons's sentencing and his direct appeal. *Id.* at 1163, 1165, 1171. In addition, an objection was raised at trial in *Simmons*. *Id.* at 1167.

*Abu-Jamal*, 555 A.2d at 848–50; *PCRA Appeal Op.*, 720 A.2d at 555–56, and accordingly, we apply § 2254(d).[23] Abu-Jamal has not provided sufficient evidence to establish that the Pennsylvania Supreme Court's determination was an unreasonable application of *Batson*. It was not objectively unreasonable to find Abu-Jamal had not established a prima facie case based on either a pattern of peremptory strikes or any other circumstances.

## IV.

Abu-Jamal contends his constitutional rights were violated when the prosecutor, during his guilt-phase summation, stated that if the jury should find Abu-Jamal guilty, "of course there would be appeal after appeal and perhaps there could be a reversal of the case, or whatever, so that may not be final." This comment, Abu-Jamal maintains, undermined the reasonable doubt standard and the jury's sense of responsibility for its verdict by suggesting that if jurors were unsure of his guilt, they should nevertheless convict because there would be further review in later proceedings. Abu-Jamal contends this violated

---

[23]The Pennsylvania Supreme Court's decision was not contrary to Supreme Court precedent. Because the court identified and applied the correct legal standard, *Batson*, it did not apply "a rule that contradicts the governing law set forth" by the Supreme Court, nor are the facts here "materially indistinguishable" from the facts in *Batson*. *Williams*, 529 U.S. at 405.

his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the Constitution.

The Commonwealth contends the prosecutor's comments did not infringe Abu-Jamal's right to a jury trial, his right to the presumption of innocence, or his right not to be convicted unless proven guilty beyond a reasonable doubt. Rather, when viewed in their full context, the Commonwealth contends, the prosecutor's comments accurately informed the jury of the appellate court's role. The acknowledgment of an appeals process, the Commonwealth contends, is common knowledge and was not improper. In addition, the Commonwealth contends the judge emphasized at several points in the trial that only the court was responsible for determining all matters of law and that the arguments of the attorneys were neither law nor evidence. These instructions, the Commonwealth contends, were sufficient to overcome any possible misunderstanding.

On direct review, the Pennsylvania Supreme Court concluded Abu-Jamal had waived this claim by failing to object to the prosecutor's comments when they were made, and by failing to raise it in post-trial motions or as part of an ineffective assistance of counsel claim. *Abu-Jamal*, 555 A.2d at 854. The Pennsylvania Supreme Court noted that in a non-capital case the claim would be summarily dismissed as having been waived. *Id.* But it decided to address the claim on the merits in light of the relaxed waiver rule then used in capital cases. *Id.* Addressing the claim on the merits, the court applied the rule that "a new trial is not required unless the unavoidable effect of

53

the prosecutor's language would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *Id.* (citing *Commonwealth v. Burton*, 417 A.2d 611 (Pa. 1980)). The court found that "[i]n the context of the entire summation, it is clear that the prosecutor was not attempting to suggest the jury should resolve any doubts by erring on the side of conviction because an error on the side of acquittal would be irreversible." *Abu-Jamal*, 555 A.2d at 854–55. The court added:

> In light of the [trial] court's repeated instructions to the jury that the arguments of counsel were neither evidence nor statements of the law to be followed, and the instructions on the Commonwealth's burden of proving all elements of the crime charged beyond a reasonable doubt, we are not persuaded that the isolated comments now complained of deprived the appellant of a fair trial.

*Id.* at 855. We note Abu-Jamal did not specifically challenge the "appeal after appeal" comment before the PCRA court or in his PCRA appeal to the Pennsylvania Supreme Court.

On federal habeas review, the District Court determined that the Pennsylvania Supreme Court's direct review ruling on the "appeal after appeal" comment was neither contrary to nor an unreasonable application of the law, and that the comments

54

did not render the jury's verdict unconstitutional. *Abu-Jamal*, 2001 WL 1609690, at *93. The court held that *Caldwell v. Mississippi*, 472 U.S. 320 (1985), discussed *infra*, is applicable only to certain types of comments made to the jury during sentencing, and it determined that "in the context of the entire trial, this comment did not deprive petitioner of a fair trial." *Abu-Jamal*, 2001 WL 1609690, at *93. The District Court noted that the prosecutor's comments, in their larger context, "stressed the importance of the jury's responsibility," and that the statements were neither misleading nor inaccurate. *Id.* (citing *Darden v. Wainwright*, 477 U.S. 168, 183 n.15 (1985)). Finally, the District Court noted that the trial court had repeatedly instructed the jury that counsel's arguments were not evidence or law. *Abu-Jamal*, 2001 WL 1609690, at *93. The District Court concluded that "considering the totality of these circumstances, this remark did not so infect petitioner's trial as to render it unconstitutional." *Id.*

Because the Pennsylvania Supreme Court applied the relaxed waiver rule and addressed the claim on its merits, we will address it here. In support of his claim, Abu-Jamal relies on *Caldwell*, in which a prosecutor told a capital sentencing jury the defense "would have you believe that you're going to kill this man and they know — they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it." *Caldwell*, 472 U.S. at 325. The trial court overruled a contemporaneous objection by the defense and the prosecutor proceeded to tell the jury "the decision you

55

render is automatically reviewable by the [state] Supreme Court. Automatically . . . ." *Id.* at 325–26.

The Supreme Court vacated the death sentence that resulted from the bifurcated *Caldwell* trial, citing its concern whether the "capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.'" *Id.* at 341. In *Caldwell*, the Court determined that the jury's awareness was undercut by the prosecutor's comments and the trial court's response. First, the trial judge failed to correct, and openly agreed with, the prosecutor's statement, "strongly implying that the prosecutor's portrayal of the jury's role was correct." *Id.* at 339. Second, the comments painted an image of the jury's role in capital sentencing that was "fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Id.* at 340 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).

Abu-Jamal concedes that *Caldwell* is limited to capital sentencing, but suggests there is a "close analogy" between comments made to the jury during the guilt phase and the sentencing phase. He relies on several state court cases, nearly all of which predate the Supreme Court's approval of bifurcated capital trials. Some of these cases turn on the prosecutor's factual misstatements to the jury about state appellate procedure; some were decided on altogether different grounds; some are inapplicable here because, like *Caldwell*, they involve the

penalty phase of trial, instructions given by the trial judge, or comments made at other points in the trial; and some involve comments by prosecutors that far exceeded those challenged here. *See, e.g.*, *State v. Jones*, 251 S.E.2d 425 (N.C. 1979); *State v. Hines*, 211 S.E.2d 201 (N.C. 1975); *People v. Morse*, 388 P.2d 33 (Cal. 1964); *Pait v. State*, 112 So. 2d 380 (Fla. 1959); *People v. Johnson*, 30 N.E.2d 465 (N.Y. 1940); *Davis v. State*, 161 N.E. 375 (Ind. 1928); *Hammond v. State*, 120 S.E. 539 (Ga. 1923); *Blackwell v. State*, 79 So. 731 (Fla. 1918); *Beard v. State*, 95 So. 333 (Ala. Crim. App. 1923).

The Pennsylvania Supreme Court was not objectively unreasonable in determining *Caldwell* was inapplicable because the comments at issue were made during the guilt phase. *See Darden*, 477 U.S. at 183 n.15 (noting *Caldwell* applies to "comments by a prosecutor during the sentencing phase of trial to the effect that the jury's decision as to life or death was not final, [and] that it would automatically be reviewed by the [s]tate Supreme Court, and that the jury should not be made to feel that the entire burden of the defendant's life was on them"); *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) ("[*Caldwell* is] relevant only to certain types of comment[s] — those that mislead the jury . . . to feel less responsible than it should for the sentencing decision.") (internal quotations omitted). In addition, the Pennsylvania Supreme Court was not objectively unreasonable in concluding the trial was not so infected with unfairness as a result of these comments that Abu-Jamal's due process rights were violated. Together, the prosecutor's full

57

statement to the jury and the court's instructions stressed, rather than diminished, the responsibility faced by the jury. *Darden*, 477 U.S. at 183 n.15 (noting courts should consider the prosecutor's comments in the context of the facts and circumstances of the entire case when determining whether a prosecutor's argument rendered a trial unfair). The trial court gave repeated instructions to the jury that the arguments of counsel were not evidence or law. And, the comments did not manipulate or misstate the evidence or any facts.[24] *Id.* at 181–82. In any event, the comments did not rise to the "sort of egregious misconduct" that amounts to a denial of constitutional due process, *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974), and they did not have a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Abu-Jamal*, 2001 WL 1609690, at *92 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). For these reasons, the Pennsylvania Supreme Court's decision was neither contrary to nor an

---

[24]*Caldwell* also suggests that the truth or falsity of a prosecutor's comments may be an essential factor in determining whether they merit vacating a death sentence. 472 U.S. at 342 (O'Connor, J., concurring in part) ("[T]he prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility."); *see also Romano*, 512 U.S. at 10 (finding capital jury's sense of responsibility was not diminished where jury was presented evidence of defendant's prior death sentence because the evidence did not mislead).

unreasonable application of Supreme Court precedent.

## V.

Abu-Jamal contends Judge Sabo, the Court of Common Pleas Judge who presided over both the trial and post-conviction review, was biased against him during PCRA review, which deprived him of his right to due process as guaranteed by the Fifth and Fourteenth Amendments. Abu-Jamal presented this claim to the Pennsylvania Supreme Court on PCRA review, arguing the judge's bias at the post-conviction proceeding required his recusal. The Pennsylvania Supreme Court found no merit to the claim, noting that "the judge's duty to maintain the judicial decorum of the proceedings was, at times, met with great resistance . . . [but u]pon review of the entire record, we cannot conclude that any of Judge Sabo's intemperate remarks were unjustified or indiscriminate nor did they evidence a settled bias against Appellant." *PCRA Appeal Op.*, 720 A.2d at 89–90.

The District Court held Abu-Jamal's judicial bias allegations were not cognizable on state habeas review because "a viable habeas claim cannot be predicated on petitioner's allegation of error in his PCRA hearing." *Abu-Jamal*, 2001 WL 1609690, at *129. The District Court adopted the reasoning of the majority of courts of appeals that had decided the issue. *Id.* at *128–29, n.96. The District Court also noted it had determined the state court fact-finding "to be reasonable, or, if unreasonable, not the basis of the state court's decision" and that the state courts' denial of this claim was not contrary to or an

59

unreasonable application of federal law.  *Id.* at \*129, 130.

In granting a certificate of appealability to determine whether Abu-Jamal was denied due process during post-conviction proceedings, we directed the parties to address whether denial of due process resulting from alleged judicial bias during state post-conviction proceedings can be grounds for federal habeas corpus relief.  In the meantime, we addressed the issue in another case, holding that alleged errors in collateral proceedings are not a proper basis for habeas relief.  *See Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("[H]abeas proceedings are not the appropriate forum . . . to pursue claims of error at the PCRA proceeding . . . .  It is the original trial that is the 'main event' for habeas purposes.").  As we explained in *Lambert*:

> The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States.  Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation.  We have often noted the general proposition that habeas proceedings are 'hybrid actions'; they are 'independent civil

60

dispositions of completed criminal proceedings.'
Federal habeas power is 'limited . . . to a
determination of whether there has been an
improper detention by virtue of the state court
judgment.'

*Id.* (quoting *Hassine v. Zimmerman*, 160 F.3d 941, 954–55 (3d Cir. 1998)) (internal citations omitted). Accordingly, this claim is not a cognizable basis for habeas relief. *Lambert*, 387 F.3d at 247.[25]

## VI.

The District Court granted relief on Abu-Jamal's claim that the jury instructions and verdict form employed in the sentencing phase of Abu-Jamal's trial were constitutionally

---

[25]Even though error in state collateral proceedings cannot be grounds for federal habeas relief, the error "may affect the deference we owe the court's findings under § 2254(d) and 2254(e)(1)." *Lambert*, 387 F.3d at 247. The Pennsylvania Supreme Court concluded that the PCRA proceedings were conducted without error. *PCRA Appeal Op.*, 720 A.2d at 121. Specifically, it held, *inter alia*, that there was an insufficient showing of bias to warrant recusal. *Id.* at 90–91. This decision is not contrary to or an unreasonable application of federal law, nor is it based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). But, even under a de novo standard, we will affirm.

defective under *Mills v. Maryland*, 486 U.S. 367 (1988), and *Boyde v. California*, 494 U.S. 370 (1990), and found the Pennsylvania Supreme Court was objectively unreasonable in finding otherwise. The District Court found a "'reasonable likelihood that the jury has applied the . . . instruction [and form] in a way that prevents the consideration of constitutionally relevant evidence' regarding the existence of mitigating circumstances (i.e., those weighing against the imposition of the death penalty)." *Abu-Jamal*, 2001 WL 1609690, at \*1 (quoting *Boyde*, 494 U.S. at 380 (alteration in original)). The Commonwealth appealed the District Court's grant of relief on this claim.

## A.

The Commonwealth contends Abu-Jamal did not exhaust the *Mills* claim as required by 28 U.S.C. § 2254(b)(1)(A), alleging Abu-Jamal only raised the claim in state court as one of ineffective assistance of counsel and based his argument only on the verdict form, not on the court's instructions to the jury. A petitioner seeking relief under § 2254 must exhaust "the remedies available," *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000), by "present[ing] in substance the same claim he is now seeking to have the federal courts review. Even if a state court fails to rule on the merits of a claim, a properly presented claim will be considered exhausted." *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004) (internal citations omitted); *see also Baldwin v. Reese*, 541 U.S. 27, 33 (2004) ("[A] state prisoner does not 'fairly present' a claim to a state court if that

62

court must read beyond a petition or a brief (or similar document) that does not alert it to the presence of a federal claim in order to find material . . . that does so.").

The Supreme Court decided *Mills* in 1988, while Abu-Jamal's claim was on direct appeal to the Pennsylvania Supreme Court.[26] Abu-Jamal first raised the *Mills* claim on PCRA review. The PCRA court found that because Abu-Jamal failed to assert this claim at trial or on direct appeal, "this claim should be waived," and could not form the basis for PCRA relief. *PCRA Op.*, 1995 WL 1315980, at \*111. The PCRA court then considered the *Mills* claim on the merits in the alternative but did not find a constitutional violation, concluding that similar verdict forms and instructions had been upheld in *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 306–08 (3d Cir. 1991), and by the Pennsylvania Supreme Court. *Id.* The Pennsylvania Supreme Court, reviewing the PCRA court, noted "[Abu-Jamal] next submits that the penalty phase verdict form was constitutionally defective pursuant to the dictates of *Mills v. Maryland* . . ." and then proceeded to address the *Mills* claim on the merits. *PCRA Appeal Op.*, 720 A.2d at 119. Because Abu-Jamal presented the *Mills* claim to the state courts on the merits, we find this claim

---

[26]We need not conduct retroactivity analysis under *Teague v. Lane*, 489 U.S. 288 (1989), because Abu-Jamal's conviction did not become final until the United States Supreme Court denied his petition for writ of certiorari on October 1, 1990, which was after the Court decided *Mills*. *See id.* at 310.

exhausted and properly before us for review.

Additionally, the Commonwealth contends that Abu-Jamal's *Mills* claim is procedurally defaulted for purposes of habeas review. "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (internal quotations omitted); *see also Coleman v. Thompson*, 501 U.S. 722, 739 (1991) (noting a claim is not procedurally defaulted if it "fairly appears that a state court judgment rested primarily on federal law or was interwoven with federal law"). Our review is foreclosed if the last state court to consider the issue "addresses the merits of the federal claim only in the course of resolving another, independent [ineffective assistance of counsel] claim." *Sistrunk*, 96 F.3d at 675.

Abu-Jamal asserted the *Mills* claim for the first time on collateral review. The PCRA court stated:

> [Abu-Jamal] fails to raise this claim at trial or on direct appeal. Therefore, this claim should be waived. As [Abu-Jamal] has not overcome that procedural bar, the claim is [sic] should be precluded from PCRA review and may not be further considered. 42 Pa. Cons. Stat. § 9543(a)(3). The following discussion of the merits is undertaken in the alternative.

64

*PCRA Op.*, 1995 WL 1315980, at *111. The PCRA court proceeded to discuss the merits only "in the alternative." *Id.*

On appeal of the denial of state collateral relief (PCRA) Abu-Jamal challenged the previous *Mills* rulings on ineffective assistance of counsel grounds as well as on the merits. Upon review of the PCRA court's decision, the Pennsylvania Supreme Court addressed the *Mills* claim on the merits. The court did not clearly state it was addressing the merits of the *Mills* claim as a component of an ineffective assistance of counsel claim nor did it expressly find the claim waived. The court's discussion of waiver, relegated to a footnote at the beginning of its opinion, *see PCRA Appeal Op.*, 720 A.2d at 88 n.9, is insufficient to bar our review. The court did not enumerate which claims, if any, it would address only as ineffective assistance claims. Without a clear and express statement that the state court disposed of this specific claim on independent state procedural grounds, we cannot find the claim procedurally defaulted.[27]

On the merits, the Commonwealth contends our review is limited to an assessment of the verdict form. The Commonwealth maintains Abu-Jamal only raised a *Mills* claim

---

[27]As noted, the Pennsylvania Supreme Court applied a relaxed waiver rule to all issues arising in a death penalty case. Since a strict waiver rule was not firmly established and regularly followed, state law procedural grounds are not an adequate basis to support the judgment and cannot be a ground for procedural default.

based on the structure of the verdict form and did not fairly present an allegation of *Mills* error based on the jury instructions. But in his briefs to both the PCRA court and the Pennsylvania Supreme Court on PCRA review, Abu-Jamal raised allegations of *Mills* error grounded in both the verdict form and the trial court's jury instruction.[28] In his brief to the Pennsylvania Supreme Court on PCRA review, Abu-Jamal focused his argument on the structure of the verdict form, but he cited *Mills* for the proposition that the combined effect of the jury instructions and the verdict form may result in constitutional error, arguing, "[n]othing in the court's instructions would have corrected the jury's probable misunderstanding based on the form. The Court must follow *Mills* and vacate the death sentence." The PCRA court addressed both the jury instructions and the verdict form, noting "[t]he constitutionality of similar verdict forms, along with the instructions given here, has repeatedly been upheld." *PCRA Op.*, 1995 WL 1315980, at *111. Even though the Pennsylvania Supreme Court in its *Mills* analysis on PCRA review only considered the verdict form, we find Abu-Jamal raised a *Mills* claim based on both the verdict form and the jury instructions. Therefore, we will not consider either in isolation.

Our review is limited to whether the Pennsylvania

---

[28]As noted, Abu-Jamal did not raise a *Mills* claim at trial or on direct review to the Pennsylvania Supreme Court, but he first raised it on PCRA review.

66

Supreme Court unreasonably applied *Mills*. *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405. The Pennsylvania Supreme Court correctly identified the applicable Supreme Court precedent, *Mills*, and the facts here are not "materially indistinguishable" from the facts in *Mills*. *See Williams*, 529 U.S. at 406.[29] Accordingly, the Pennsylvania Supreme Court's conclusion was not "contrary to" *Mills*, and we need only determine whether the court's conclusion was "objectively unreasonable." 28 U.S.C. § 2254(d).

**B.**

Abu-Jamal contends the verdict form unconstitutionally precluded members of the jury from considering a particular mitigating circumstance unless there was unanimous agreement as to its proof. Abu-Jamal maintains the jury instructions compounded this error. The Commonwealth contends the Pennsylvania Supreme Court's decision did not unreasonably apply Supreme Court precedent under the AEDPA standard of review, citing *Zettlemoyer*. The Pennsylvania Supreme Court affirmed the PCRA court's denial of post-conviction relief on the *Mills* claim. *PCRA Appeal Op.*, 720 A.2d at 119. We must determine whether the Pennsylvania Supreme Court decision was unreasonable in light of *Mills* and *Boyde*.

---

[29]Of course, if the facts were materially indistinguishable then the Pennsylvania Supreme Court's conclusion would be "contrary to" *Mills*.

67

In *Mills*, the Supreme Court vacated a death sentence after finding there was a "substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384. In capital cases, a juror must "be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy v. North Carolina*, 494 U.S. 433, 442–43 (1990); *see also Mills*, 486 U.S. at 374–75; *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion).

The petitioner in *Mills* challenged Maryland's capital sentencing statute, as applied to him, contending a reasonable juror could have understood the verdict form and the judge's instructions to require jury unanimity on any mitigating circumstances. The Court considered an "intuitively disturbing" hypothetical situation:

> All 12 jurors might agree that some mitigating circumstances were present, and even that those mitigating circumstances were significant enough to outweigh any aggravating circumstance found to exist. But unless all 12 could agree that the same mitigating circumstance was present, they would never be permitted to engage in the

68

> weighing process or any deliberation on the appropriateness of the death penalty.

*Mills*, 486 U.S. at 374. The Court concluded that even though a constitutional construction of Maryland's sentencing scheme was possible, reasonable jurors could have interpreted the verdict form and judge's instructions to preclude consideration of mitigating circumstances if not found unanimously. Accordingly, the Court vacated Mills's sentence because "[t]he possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." *Id.* at 384.

In *Mills*, the Court posed "[t]he critical question . . . whether petitioner's interpretation of the sentencing process is one a reasonable jury could have drawn from the instructions given by the trial judge and from the verdict form employed in this case." *Id.* at 375–76. In *Boyde v. California*, 494 U.S. 370 (1990), the Supreme Court clarified the legal standard as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380. The District Court found the Pennsylvania Supreme Court's determination unreasonable. We agree.

Turning to this case, we examine the verdict form used at trial. The first page of the three-page verdict form stated, in part:

> (1) We, the jury, unanimously sentence the defendant to

[X]    death

[  ]    life imprisonment.

(2) (To be used only if the aforesaid sentence is death)
We, the jury, have found unanimously

[  ]    at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) is/are

_____

_____.

[X]    one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s) is/are _____ A

_____.

The mitigating circumstance(s) is/are

_____ A _____.

The second page of the verdict form listed the possible aggravating circumstances and the third page listed the possible mitigating circumstances, each with a designated space for the jury to check those aggravating or mitigating circumstances found. Neither the second nor the third page had additional instructions. At the bottom of the third page, the jurors signed their names and dated the form.

The jury charge here recited, in part:

Members of the jury, you must now decide whether the defendant is to be sentenced to death

70

or life imprisonment.  The sentence will depend upon your findings concerning aggravating and mitigating circumstances.  The Crimes Code provides that a verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances.

The verdict must be a sentence of life imprisonment in all other cases . . . .  The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt.  The defendant has the burden of proving mitigating circumstances, but only by a preponderance of the evidence.  This is a lesser burden of proof than beyond a reasonable doubt.  A preponderance of the evidence exists where one side is more believable than the other side . . . .

Now, the verdict is for you, members of the jury.  Remember and consider all of the evidence giving it the weight to which it is entitled.  Remember that you are not merely recommending a punishment.  The verdict you return will actually fix the punishment at death or life imprisonment.  Remember again that your verdict must be unanimous.  It cannot be reached by a majority vote or by any percentage.  It must

be the verdict of each and everyone [sic] of you.

Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances. Or, if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment.

The court then read the verdict form to the jury.

The Pennsylvania Supreme Court on PCRA review found there was no *Mills* violation. *PCRA Appeal Op.*, 720 A.2d at 119. It reached this conclusion without evaluating whether there was a reasonable likelihood that the jury could have misinterpreted the entire scheme employed at the sentencing phase, that is, the structure and substance of the verdict form together with the oral instructions from the judge. As noted, the Pennsylvania Supreme Court did not consider the judge's jury instructions. Instead, the court focused and relied on the verdict form in finding no merit to the *Mills* claim. *Id.* In its opinion, the Pennsylvania Supreme Court only addressed the verdict form, stating:

The verdict slip employed in the instant case consisted of three pages. The requirement of unanimity is found only at page one in the section wherein the jury is to indicate its sentence. The

72

second page of the form lists all the statutorily enumerated aggravating circumstances and includes next to each such circumstance a designated space for the jury to mark those circumstances found. The section where the jury is to checkmark those mitigating circumstances found, appears at page three and includes no reference to a finding of unanimity. Indeed, there are no printed instructions whatsoever on either page two or page three.

*Id.* In addition, the court found that the jurors' signatures on the third page was "of no moment since those signature lines naturally appear at the conclusion of the form and have no explicit correlation to the checklist of mitigating circumstances." *Id.* The court then held it could not conclude "that the structure of the form could lead the jurors to believe that they must unanimously agree on mitigating evidence before such could be considered." *Id.* In reaching its conclusion, the Pennsylvania Supreme Court noted it had upheld similar verdict forms against a *Mills* challenge. *Id.*

The District Court found the Pennsylvania Supreme Court's decision was objectively unreasonable under *Mills* and *Boyde*. *Abu-Jamal*, 2001 WL 1609690, at *126. The court relied upon several factors to reach this conclusion, including the Pennsylvania Supreme Court's failure to address "the consequence of the jury instructions in this case, much less to reach a reasonable conclusion regarding the effect of the *Jamal*

73

charge, and [it] compounded this error by unreasonably failing to perceive the probable impact of the verdict form on the jury's impression regarding the need for unanimity."[30] *Id.* The court concluded the verdict form and jury instructions "created a reasonable likelihood that the jury believed that it was precluded from considering a mitigating circumstance that had not been found unanimously to exist." *Id.*

We agree the Pennsylvania Supreme Court's failure to address the entire sentencing scheme resulted in an incomplete and unreasonable application of *Mills* and *Boyde*. It was unreasonable for the Pennsylvania Supreme Court to reach its conclusion that the "structure of the form," *PCRA Appeal Op.*, 720 A.2d at 119, could not lead to juror confusion based on only a portion of the form, rather than the entire form, and without evaluating whether there was a reasonable likelihood of jury confusion based on an interpretation of the judge's jury instructions and the entire verdict form together.

The verdict form's first page, especially the language that stated "we, the jury, have found unanimously . . . one or more aggravating circumstances which outweigh any mitigating circumstances," reads that both aggravating and mitigating circumstances must be found unanimously. There is nothing in the verdict form to clarify that the jury should apply the

---

[30]The District Court also relied upon *Banks v. Horn*, 271 F.3d 527, 547–48 (3d Cir. 2001), which subsequently was reversed on other grounds, *see Beard v. Banks*, 542 U.S. 406 (2004).

unanimity requirement to aggravating circumstances, but not to mitigating circumstances. *See Mills*, 486 U.S. at 378–79 (recognizing absence of an explicit instruction to jury indicating how jury should behave if some, but not all, find a mitigating circumstance to apply to the defendant). The Pennsylvania Supreme Court did not evaluate whether this language would create a reasonable likelihood the jury had applied the form in violation of *Mills*. Furthermore, the jury instructions risked jury confusion about a unanimity requirement for both aggravating and mitigating circumstances. Throughout the jury instructions, the court repeatedly emphasized unanimity in close relation to its discussion of mitigating circumstances. The jury charge stated: "The Crimes Code provides that a verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." The trial court reinforced the impression that unanimity had to be found for both aggravating and mitigating circumstances by stating, "remember again that your verdict must be unanimous. It cannot be reached by a majority vote or by any percentage. It must be the verdict of each and every one of you." The judge's charge did not instruct the jury to distinguish between mitigating and aggravating circumstances in their application of the unanimity requirement. This absence is notable because the trial court distinguished between the burdens of proof the jury should apply to mitigating and aggravating circumstances. The risk of confusion is higher where the court distinguishes between

75

aggravating and mitigating circumstances on one ground, but not on any other. For these reasons, we conclude that the verdict form together with the jury instructions were misleading as to whether unanimity was required in consideration of mitigating circumstances.

We have examined similar instructions in previous cases and found *Mills* violations. *See Albrecht*, 485 F.3d at 119–120 (finding a *Mills* violation, but vacating the District Court's order granting habeas relief after applying *Teague*); *Banks*, 271 F.3d at 547–48 (granting a writ of habeas corpus, after applying AEDPA standard of review, because jury instruction and verdict form caused *Mills* error), *rev'd on other grounds by Beard v. Banks*, 542 U.S. 406 (2004); *Frey v. Fulcomer*, 132 F.3d 916, 923–24 (3d Cir. 1997) ("conclud[ing] that the charge in this case was ambiguous, reasonably likely to confuse the jury, and thus in error" under *Mills*, without applying AEDPA standard of review). The Commonwealth contends the Pennsylvania Supreme Court could not have been unreasonable because we found no *Mills* violation in *Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3d Cir. 1991). *See id.* at 307–08 (finding no *Mills* violation where the instructions had a seventeen word separation between the unanimity clause and the mitigating circumstances clause). But *Zettlemoyer* is in tension with *Frey* and we will not engage in a sentence-level parsing of the language employed. Our analysis relies on United States Supreme Court precedent in finding a *Mills* violation.

We conclude the Pennsylvania Supreme Court's decision

76

was objectively unreasonable under the dictates of *Mills* and *Boyde*. The jury instructions and the verdict form created a reasonable likelihood that the jury believed it was precluded from finding a mitigating circumstance that had not been unanimously agreed upon. Accordingly, we will affirm the District Court's grant of relief on this claim.

## VII.

For the foregoing reasons, we will affirm the District Court's judgment, which granted a writ of habeas corpus as to the *Mills* sentencing phase claim, but denied the petition for the balance of the claims asserted. As the District Court noted, the "Commonwealth of Pennsylvania may conduct a new sentencing hearing in a manner consistent with this opinion within 180 days of the Order accompanying this [opinion], during which period the execution of the writ of habeas corpus will be stayed, or shall sentence [Abu-Jamal] to life imprisonment." *Abu-Jamal*, 2001 WL 1609690, at *130.

AMBRO*,* Circuit Judge*,* concurring in part and dissenting in part:

Excluding even a single person from a jury because of race violates the Equal Protection Clause of our Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 84–86, 99 n.22 (1986). This simple justice principle was reaffirmed by our Supreme Court this past week. *Snyder v. Louisiana*, No. 06-10119, 2008 WL 723750, at *4 (Mar. 19, 2008).

77

The Supreme Court in *Batson* acknowledged how important this principle is by replacing the standard it set out but two decades before in *Swain v. Alabama*, 380 U.S. 202 (1965). *Swain* required a defendant to show proof of racially discriminatory peremptory challenges over a *series of cases*; after *Batson*, a defendant may "make a prima facie showing of purposeful racial discrimination in the selection of the venire by relying solely on the facts concerning . . . *his case.*" *Batson*, 476 U.S. at 95 (emphasis in original). In so holding, the Court made no statement that a defendant forfeited his right to a fair jury trial of his peers if he failed to object to a prosecutor's racially discriminatory use of peremptory strikes in jury selection during the selection itself. Nor did it impose an onerous burden on a defendant to set in motion *Batson*'s burden-shifting framework by making a *prima facie* case.

Against this backdrop, I cannot agree with the imposition by my colleagues in the majority of a contemporaneous objection requirement for violations of equal protection in jury selection. They nevertheless reach the merits despite this procedural ruling, and I do not agree with them that Mumia Abu-Jamal fails to meet the low bar for making a *prima facie* case under *Batson*. In holding otherwise, they raise the standard necessary to make out a *prima facie* case beyond what *Batson* calls for. A *prima facie* case, the first step in the three-step *Batson* analysis, does not mean a defendant prevails. It does mean that he is permitted to proceed to the next step. Because we do not so proceed when I believe we should, I respectfully

78

dissent as to these issues.[31]

## I. Contemporaneous Objection Rule

I address first this case's newly created contemporaneous objection rule for *habeas* petitions. This rule imposes, as a prerequisite to the federal claim, the requirement that a defendant make a "timely"[32] objection to the prosecutor's racially based use of peremptory challenges. It goes against the grain of our prior actions, as our Court has addressed *Batson* challenges on the merits without requiring that an objection be made during jury selection in order to preserve *habeas* review.

**A. Should Our Court Require a Contemporaneous Objection in a State-Court Trial as a Prerequisite to a Federal *Batson* Claim?**

As my colleagues concede, Abu-Jamal's failure to lodge

---

[31] I agree with my colleagues on all other issues save Section VI.B of the majority opinion. There I concur in the judgment that a violation of *Mills v. Maryland*, 486 U.S. 367 (1988), has occurred in sentencing. Among other reasons, that outcome follows our controlling precedents in *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir. 1997), and *Banks v. Horn*, 271 F.3d 527 (3d Cir. 2001), *rev'd on other grounds*, 536 U.S. 266 (2002).

[32] My colleagues, regretably, do not define what in their opinion is a "timely" objection for the purpose of preserving a *Batson* claim.

an objection to the exclusion of black potential jurors contemporaneous to that event would not result in a state procedural bar[33] because the Pennsylvania Courts (with the federal District Court following suit) considered Abu-Jamal's *Batson* claim on its merits.  But in this case our Court imposes a federal contemporaneous objection requirement—as a prerequisite for a *Batson* claim—in addition to any potential state procedural bar.  I do not agree with such a requirement, and I do not believe that Abu-Jamal forfeited his right to present a *Batson* claim by failing to lodge an objection before trial.

No doubt an objection made at the time of a prosecutor's constitutionally infirm use of a peremptory challenge is most apt to ensure that *Batson* issues are addressed expediently and efficiently.  The trial judge can best set the right remedy quickly, such as "discharg[ing] the venire and select[ing] a new jury from a panel not previously associated with the case or . . . disallow[ing] the discriminatory challenges and resum[ing] selection with the improperly challenged jurors reinstated on the venire." *Batson*, 476 U.S. at 99 n.24 (citations

---

[33] It is well-established that a federal court will not consider "'a question of federal law decided by a state court if the decision of that [state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Lambrix v. Singletary*, 520 U.S. 518, 522–23 (1997) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

80

omitted). After the jury is seated and the trial proceeds, the ante escalates; if we determine that the prosecution exercised its peremptory challenges in violation of *Batson*, "our precedents require that [a] petitioner's conviction be reversed." *Id.* at 100.

That a contemporaneous objection is helpful in the context of *Batson* does not mean, however, that it is constitutionally called for. The Supreme Court has never announced a rule requiring a contemporaneous objection as a matter of federal constitutional law, and I see no reason for us to do so now. The Court, in leaving the implementation of the *Batson* decision to the trial courts, stated that "[w]e decline . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Id.* at 99. My colleagues believe this demonstrates that the Supreme Court "'envisioned an objection raised during the jury selection process'" prior to trial. *See* Maj. Op. 18–19 (quoting *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir. 1996)). What they overlook is that, even if the Supreme Court "envisioned" an objection, it authorized the states to craft rules for it as a matter of state procedural law.[34] Thus, I read this

---

[34] This view is confirmed by the Supreme Court's opinion in *Ford v. Georgia*, where it noted that "[i]n *Batson* . . . we . . . declined . . . to decide when an objection must be made to be timely. Instead, we recognized that local practices would indicate the proper deadlines . . . ." 498 U.S. 411, 423 (1991) (citation omitted). For further discussion of *Ford*, see *infra* Part

81

sentence from *Batson* as emphasizing that the Court trusts the state courts to fashion their own protocol and will not "formulate particular procedures to be followed," including the procedures governing the timeliness of an objection. *See Batson*, 476 U.S. at 99.

And that is as it should be. As stated above, the trial court has significantly more options to address a *Batson* violation when it is discerned during jury selection. But nowhere in the Supreme Court's grant of discretion to trial courts is the pronouncement that, where a contemporaneous objection is not made and the state courts nonetheless consider the *Batson* claim on the merits, a federal court will subsequently be barred from reviewing the merits of a petitioner's claim that the prosecution's use of a peremptory challenge violated the Constitution. Our Court today makes that pronouncement.

B. **Subsequent Supreme Court Caselaw on Contemporaneous Objections in *Batson* Cases: *Ford v. Georgia***

Since *Batson*, the Supreme Court still has not indicated that a contemporaneous objection is a prerequisite to a federal *Batson* claim. To the contrary, in *Ford v. Georgia*, 498 U.S. 411

---

I.B.

(1991),[35] the Court reaffirmed "[t]he appropriateness in

---

[35] *Ford* concerned the adequacy of a new state procedural rule that required *Batson* claims to be raised after the jury was selected but before jurors were sworn. Ford had made his objection before, but not at, jury selection, and the State of Georgia argued that it was therefore untimely under the rule. *Ford*, 498 U.S. at 419, 421. The Supreme Court had to decide whether Georgia's rule—created after Ford's trial—operated as an independent and adequate state ground to preclude federal consideration of Ford's *Batson* claim on the merits. It held that, as a general matter, "[u]ndoubtedly . . . a state court may adopt a general rule that a *Batson* claim is untimely if it is raised for the first time on appeal, or after the jury is sworn, or before its members are selected." *Id.* at 423. However, the Court went on to determine that Georgia's procedural rule was not an "adequate and independent state procedural bar" because it had not been developed until after Ford's trial. *Id.* at 424. To apply it retroactively, the Court reasoned, "would therefore apply a rule unannounced at the time of petitioner's trial and consequently inadequate to serve as an independent state ground." *Id.*

Interestingly, it is at least arguable that Abu-Jamal presented an objection before trial in much the same way that Ford did. On March 18, 1982, before jury selection or trial had started, Abu-Jamal filed a pretrial motion seeking to distribute questionnaires to the potential members of his jury venire pool in an effort to ensure that he was tried by "a fair and impartial

83

jury." Transcript of March 18, 1982, at 11–13. At the motion hearing, the following colloquy took place between Abu-Jamal's counsel and the Court:

> [Defense counsel:] We—as Your Honor well knows—we have twenty peremptory challenges in a criminal case. It has been the custom and the tradition of the District Attorney's Office to strike each and every black juror that comes up peremptorily. It has been my experience since I have been practicing law, as well as the experience of the defense bar, . . . that that occurs.
>
> . . . .
>
> The Court: The district attorney says he does not agree with that statement.
>
> . . . .
>
> [Defense counsel:] . . . I am not saying, Your Honor, that that questionnaire or any other procedure that Your Honor might approve would in fact insure any black representation on the jury. What I am saying is that even if it's an all white jury, Your Honor, I want to be certain that it's a fair and impartial jury.

*Id.* at 12–13.

The District Court did not acknowledge this portion of the record. *See Abu-Jamal v. Horn*, No. 99-5089, 2001 WL 1609690, at *105 (E.D. Pa. Dec. 18, 2001). My colleagues mention it in a footnote and discount it on the basis that "Abu-

84

general of looking to local rules for the law governing the timeliness of a constitutional claim." *Id.* at 423. It continued:

> In *Batson* itself, for example, we imposed no new procedural rules and declined either "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges," or to decide when an objection must be made to be timely.

---

Jamal's motion to distribute a questionnaire to all prospective jurors is different from lodging a timely objection during the jury selection process." Maj. Op. 27 n.10. However, this colloquy served to put the trial court on notice that the prosecutor might use peremptory challenges in a discriminatory fashion. Defense counsel framed the issue in a manner consistent with the then-prevailing *Swain* standard, which required a defendant to demonstrate that a prosecutor repeatedly struck blacks over a number of cases to make out a claim for an equal protection violation in the prosecutorial use of peremptory strikes. *See Swain*, 380 U.S. at 223–24. If my colleagues are driven to create a contemporaneous objection rule because it "alert[s] the [trial] judge to errors that might be corrected in the first instance and give[s] the judge the opportunity to develop a complete record of the jury selection process for appellate review," Maj. Op. 23, it is reasonable that they should inquire whether the above colloquy could have served to put the trial judge on adequate notice. They do not do so, and thus this inquiry fails for lack of a second vote.

85

> Instead, we recognized that local practices would indicate the proper deadlines in the contexts of the various procedures used to try criminal cases, and we left it to the trial courts, with their wide "variety of jury selection practices," to implement *Batson* in the first instance.

*Id.* (citations omitted). The Court was explicit in stating that the issue of "when an objection must be made to be timely" is a matter of "local practice[]" rather than federal law. Moreover, it never indicated that, as a matter of federal law, a "general rule" of timeliness existed. Thus, the presence or absence of a contemporaneous objection is purely an issue of state procedural law. If a state court rejects a defendant's *Batson* claim as a matter of state law because it was not made within the timeframe specified by the state's procedural rules, and the federal court determines that the state rule functions as an independent and adequate basis for decision, then the federal court will be procedurally barred from hearing the claim. *See supra* n.33; *cf. Cabrera v. Barbo*, 175 F.3d 307, 312–13 (3d Cir. 1997). However, where the state does not require such an objection—or, as here, where the Commonwealth's relaxed waiver rule is not capable of serving as an independent and adequate state law procedural bar—the federal court should proceed to the merits of the *Batson* claim.

My colleagues respond that the Court's analysis of Georgia's state procedural rule in *Ford* is not directly controlling on whether there is a parallel federal rule. To be

86

sure, it would be helpful if the Supreme Court had explicitly renounced the existence of a federal contemporaneous objection rule. Yet it cannot be ignored that the Court in *Ford* implicitly relied on the non-existence of such a federal analog. It determined that Georgia's procedural rule about the timing of a *Batson* objection did not bar consideration of the issue in federal court. If a federal contemporaneous objection rule did exist as an independent bar, one would expect the Court to have considered next whether Ford had satisfied that rule.

## C.    Caselaw of Our Court

Our Court has previously reached the merits of *Batson* claims on *habeas* review in cases where the petitioner did not make a timely objection during jury selection—signaling that our Circuit does not have a federal contemporaneous objection rule—and I see no reason why we should not afford Abu-Jamal the courtesy of our precedents. *See, e.g.*, *Wilson v. Beard*, 426 F.3d 653, 659 (3d Cir. 2005); *Hardcastle v. Horn*, 368 F.3d 246, 251 (3d Cir. 2004); *Riley v. Taylor*, 277 F.3d 261, 273 (3d Cir. 2001) (*en banc*).[36]

---

[36] In creating the contemporaneous objection requirement, my colleagues cite cases from other Courts of Appeals that treat the failure to lodge a contemporaneous objection as a constitutional bar to and/or waiver of the claim. *See, e.g.*, *McCrory*, 82 F.3d at 1249 ("[W]e hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection."); *Wilkerson*

87

In *Wilson*, the defendant never made a *Batson* objection pre-trial, during trial, or even in his first post-conviction collateral proceeding. After the release of a videotape detailing the Philadelphia District Attorney's suggestions on how to keep blacks off juries,[37] Wilson filed a second post-conviction

---

*v. Collins*, 950 F.2d 1054, 1063 (5th Cir. 1992) ("[The] failure to timely object at trial is a constitutional bar to [a] *Batson* challenge."). These cases, of course, are not binding precedent on our Court. To the contrary, our previous cases have reached the merits of *Batson* claims despite the absence of a contemporaneous objection.

[37]As explained in *Wilson*, the facts surrounding the videotape are as follows:

In 1997, Jack McMahon, the Assistant District Attorney who prosecuted Wilson's first case, won the Republican nomination to challenge incumbent District Attorney Lynne Abraham. On March 31, 1997, eleven days after the primary election, Abraham released a videotape from the late 1980s which showed McMahon giving a training session on jury selection to other prosecutors in the District Attorney's Office. In the tape, McMahon makes a number of highly inflammatory comments implying that he regularly seeks to keep qualified African-Americans from serving on juries. Since these comments are central to [Wilson's] appeal, we will quote from them at length.

McMahon began his presentation by reviewing the procedures followed by Pennsylvania courts in selecting juries. He then proceeded to discuss his views of the goals a prosecutor should have in mind in selecting a jury:

> The case law says that the object of getting a jury is to get—I wrote it down. I looked in the cases. I had to look this up because I didn't know this was the purpose of a jury. "Voir dire is to get a competent, fair, and impartial jury." Well, that's ridiculous. You're not trying to get that. You're—both sides are trying to get the jury most likely to do whatever they want them to do.
>
> And if you go in there and any one of you think you're going to be some noble civil libertarian and try to get jurors, "Well, he says he can be fair; I'll go with him," that's ridiculous. You'll lose and you'll be out of the office; you'll be doing corporate law.

McMahon went on to discuss certain categories of people that he believed did not make good jurors. At various times in the tape, he told the assembled prosecutors to avoid "smart people," law students and lawyers, social workers, "very esoteric people," teachers, and "intelligent doctors." But the group he

89

discussed most was African-Americans:

> And that is—and, let's face it, again, there's [sic] the blacks from the low-income areas are less likely to convict. It's just—I understand it. It's [an] understandable proposition. There is a resentment for law enforcement, there's a resentment for authority, and, as a result, you don't want those people on your jury. And it may appear as if you're being racist or whatnot, but, again, you are just being realistic. You're just trying to win the case.

McMahon told his audience that, while many types of blacks were poor jurors, certain blacks could be prosecution-friendly:

> Another factor—I'll tell you, if—you know, in selecting blacks, again, you don't want the real educated ones, again. This goes across the board of all races; you don't want smart people. And, again, but if you're sitting down and you're going to take blacks, you want older blacks. You want older black men and women, particularly men. Older black men are very good. Guys 70, 75 years old are very good jurors, generally speaking. . . .
>
> Older black women, on the other hand, when you have like a black defendant who's a

90

young boy and they can identify as his, you know—motherly type thing, are a little bit more different. . . .

The other thing is blacks from the South, excellent. . . .

In particular, he advised his audience to avoid [younger] black women:

[I]n my experience, black women, young black women[—]are very bad. There's an antagonism. I guess maybe because they're downtrodden on two respects, they got two minorities, they're women and they're . . . blacks, so they're downtrodden in two areas. . . . And so younger black women are difficult, I've found.

. . . .

In order to maintain the proper racial composition, McMahon advised his audience to record the race of potential jurors:

Another thing to do . . . when a jury comes in the room, . . . count them. Count the blacks and whites. You want to know at every point in that case where you are. . . . You don't want to look there or go, "Is there a black back there? Wait a minute. Are you a black guy?"

McMahon then proceeded to end his presentation,

ironically, with a brief discussion of the Supreme Court's decision in *Batson*:

> One other—now, I'm sure you're all familiar, if we talk about the case law—I generally don't talk much about case law, but the new case is Batson versus Kentucky. I'm sure you've all become aware of that case. . . .
>
> But in the future we're going to have to be aware of this case, and the best way to avoid any problems with it is to protect yourself. And my advice would be in that situation is when you do have a black jury, you question them at length. And on this little sheet that you have, mark something down that you can articulate [at a] later time if something happens, because if they—because the way the case is stated, that it's only after a prima facie showing that you're doing this that it becomes—that the trial judge can then order you to then start showing why you're striking them not on [a] racial basis.
>
> So if—let's say you strike three blacks to start with, the first three people. And then it's like the defense attorney makes an objection saying that you're striking blacks. Well, you're not going to be able to go back

92

and say, oh—and make something up about why you did it. Write it down right then and there.

. . . So sometimes under that line you may want to ask more questions of those people so it gives you more ammunition to make an articulable reason as to why you are striking them, not for race. So that's how to pick a jury.

*Wilson*, 426 F.3d at 656–58.

The videotape is noteworthy because it prompted Wilson to raise his *Batson* claim despite the absence of a contemporaneous objection. But it is further significant because it gives a view of the culture of the Philadelphia District Attorney's Office in the 1980s.

The District Court in Abu-Jamal's case found the tape to be "irrelevant" because it was produced five years after his trial and because he was prosecuted by someone other than McMahon. *Abu-Jamal*, 2001 WL 1609690, at *109. However, I find it difficult to believe that the culture in the Philadelphia D.A.'s Office was any better five years before the training video was made. Indeed, given that Abu-Jamal's trial preceded *Batson*, it is not far-fetched to argue that the culture of discrimination was even worse. Moreover, to the extent that this video was of a training session in the D.A.'s Office—a training session, apparently, on how to deal with the Supreme Court's

93

petition raising a *Batson* claim, *Wilson*, 426 F.3d at 658, and we reviewed it on the merits, *id.* at 666–70. If a contemporaneous objection were required as a prerequisite to the federal claim, we could not have proceeded to the merits of Wilson's claim.

Next, in *Hardcastle* the prosecutor had twenty available peremptory challenges, which she used to remove twelve of the fourteen black members of the jury venire. 368 F.3d at 251. The result was a jury that had only one black member. *Id.* Hardcastle's attorney did not object to the prosecutor's use of peremptory challenges during jury selection, but did subsequently move for a mistrial after *voir dire*—a motion that was denied.[38] *Id.* On *habeas* review, we entertained the merits

pronouncement in *Batson*—the obvious question is whether the sentiments expressed were limited specifically to one prosecutor or whether they existed throughout the office.

[38] In their discussion of the motion for a mistrial in *Hardcastle*, my colleagues appear to intimate that such a motion could suffice as a timely objection under their newly created contemporaneous objection rule. Maj. Op. 17 n.3. Given their belief that the Court in *Batson* "envisioned an objection raised during the jury selection process," Maj. Op. 18–19 (internal quotation marks omitted), I fail to see how they could construe Hardcastle's motion—made after *voir dire* was completed and the jury was empaneled, but prior to trial—as satisfying their objection requirement. Thus, not only is our Court now

94

of Hardcastle's *Batson* claim without considering whether *Batson* required a contemporaneous objection to be made during jury selection.

Finally, in *Riley* the defendant was convicted by an all-white jury, and his counsel made no *Batson* objection at the time of jury selection. 277 F.3d at 271–72, 274. When Riley raised a *Batson* claim in his *habeas* petition, the District Court held that it was procedurally defaulted because it was never presented to the trial court. *Id.* at 274. When our Court considered the issue *en banc*, we held that the claim was not procedurally barred because the last state court to consider the claim did so on the merits. *Id.* at 274–75.

Our caselaw repeats to become a simple refrain: *If a contemporaneous objection were required as a prerequisite to a federal Batson claim, we could not have reached the issue on the merits.*[39] Why we pick this case to depart from that

---

imposing an additional limitation on a criminal defendant's ability to raise a *Batson* claim, it is declining to set out the parameters of that new rule.

[39] My colleagues cite one case in which we held on direct appeal that a petitioner had waived his *Batson* claim by failing to make a contemporaneous objection. *See Gov't of the Virgin Islands v. Forte*, 806 F.2d 73, 75 (3d Cir. 1986); Maj. Op. 17. But *Forte* involved the direct appeal of a federal criminal conviction, and thus our waiver analysis was based on the

95

reasoning I do not know.  Accordingly, assuming that Abu-Jamal did not raise a timely objection, that would not be fatal to his federal *Batson* claim unless he violated a Pennsylvania state procedural rule that served as an independent and adequate state ground to preclude federal review.

**D.    The Failure to Object Contemporaneously to a *Batson* Violation Is a Matter of State Procedural Law**

Rather than looking at this as a matter of federal constitutional law, we should treat the failure to lodge a contemporaneous objection as one of state procedural law.  This approach accords with both *Batson*, in which the Supreme Court emphasized that trial courts were in the best position to address *Batson*'s implementation, 476 U.S. at 99 n.24, and *Ford*, in which the Court noted that it was appropriate to "look[] to local rules for the law governing the timeliness of a constitutional claim."  498 U.S. at 423.  As I believe the presence or absence of a contemporaneous objection is an issue of state-law procedure and not a matter of federal constitutional law, I next consider whether Abu-Jamal procedurally defaulted under Pennsylvania law.

---

operation of a Federal Rule of Criminal Procedure.  As such, *Forte* has no bearing on our analysis of whether Abu-Jamal was required to make a contemporaneous *Batson* objection in the state-court trial to preserve federal *habeas* consideration of his claim.

96

The United States Supreme Court has been unequivocal on the issue of procedural default: "If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). Here, the Pennsylvania Supreme Court considered the merits on both direct appeal and state collateral review under the Pennsylvania Post-Conviction Relief Act (PCRA). *Commonwealth v. Abu-Jamal*, 555 A.2d 846, 849–850 (Pa. 1989) (explaining that the Pennsylvania Courts often applied a relaxed waiver rule in capital cases, and then reaching the merits of Abu-Jamal's *Batson* claim); *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 114 (Pa. 1998) (reaching the merits of Abu-Jamal's *Batson* claim).

My colleagues recognize this. *See* Maj. Op. 29–35. The District Court also recognized this and found no bar to federal consideration of the *Batson* claim on the merits. *Abu-Jamal*, 2001 WL 1609690, at *104 ("Moreover, [the *Batson* claim] was adjudicated on the merits by the state courts.").

Curiously, as to the issue of procedural default here, my colleagues and I agree. *See* Maj. Op. 35. ("Without a clear and express statement that the state court denied relief on independent state procedural grounds, we cannot find the claim procedurally defaulted."). I query then why they would choose to come out now with a federal standard when that was not the law heretofore in our Circuit.

97

Because until now there has been no federal contemporaneous objection rule in our Circuit (in fact, our practice to date has been not to impose such a rule) and Abu-Jamal's claim is not procedurally barred under state law, I turn to the merits of his *Batson* claim.[40]

## II. *Prima Facie* Case

When evaluating Abu-Jamal's *Batson* claim on the merits, both the Pennsylvania Courts on appeal and post-conviction relief review, and the District Court on *habeas* review, erroneously denied the claim based on what I believe is an incorrect analysis of the legal standards governing when a *prima facie* case is made.

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), which governs our review of *habeas* cases, we must review the Pennsylvania Supreme Court's ruling on Abu-Jamal's *Batson* claim to determine whether it was "contrary to" or an "unreasonable application of" clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1); *see also Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion

_____

[40] As noted, I find it curious that, while my colleagues "believe a timely objection is required to preserve [the *Batson*] issue on appeal," Maj. Op. 28–29, they nevertheless continue on to the merits of Abu-Jamal's *Batson* claim.

98

opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A ruling fails under the "unreasonable application" prong where

> the court identifies the correct governing rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply or unreasonably refuses to extend the principle to a new context where it should apply.

*Rico v. Leftridge-Byrd*, 340 F.3d 178, 181 (3d Cir. 2003) (quoting *Gattis v. Snyder*, 278 F.3d 222, 234 (3d Cir. 2002)). The state court's application must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). While decisions of the lower federal courts are not binding precedent for state supreme courts under AEDPA, their decisions may prove instructive in discerning what is "reasonable," especially where "the governing Supreme Court precedent articulates a broad principle that applies to a wide variety of factual patterns." *Ouber v. Guarino*, 293 F.3d 19, 26 (1st Cir. 2002); *see also Matteo v. SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) ("[W]e do not believe federal habeas courts are precluded from considering the decisions of the inferior federal courts when evaluating whether the state court's application of the law was reasonable. . . . Thus, in certain cases

99

it may be appropriate to consider the decisions of inferior federal courts as helpful amplifications of Supreme Court precedent.").

It is the unreasonableness prong with which we are concerned today. My colleagues conclude that it was not "objectively unreasonable" for the Pennsylvania Supreme Court "to find [that] Abu-Jamal had not established a prima facie case based on either a pattern of peremptory strikes or any other circumstances." Maj. Op. 52. They further determine that "the record does not include evidence of the number or racial composition of the venire," rendering "the record . . . fatally deficient to support a successful challenge to the Pennsylvania Supreme Court's decision finding no prima facie case under *Batson*." Maj. Op. 48.

Despite the deferential standard of review, I believe that the Pennsylvania Supreme Court unreasonably applied *Batson* in finding that Abu-Jamal failed to satisfy his *prima facie* burden and, on that basis, denying the claim without conducting the next, required steps of the *Batson* inquiry. The evidence here points to the conclusion that there was a *prima facie* case. Moreover, that it is now impossible for a judge to engage in a more comprehensive consideration of the *Batson* challenge here (*i.e.*, without complete data about the strike and exclusion rates,[41] as well as the racial and numerical composition of the

---

[41] As the majority explains, the "strike rate" is calculated "by comparing the number of peremptory strikes the prosecutor used

100

entire jury venire) does not mean that we should dispense with *Batson*'s promise of ending discrimination in jury selection. To the contrary, Abu-Jamal is entitled to remand for consideration of his claim on the evidence that does exist and for further development of the record. *See Hardcastle*, 368 F.3d at 262.

## A. Establishing a *Prima Facie* Case Is a Light Burden

As pointed out in the majority opinion, *Batson* developed a burden-shifting framework to evaluate the constitutionality of peremptory challenges based on race: "First, the defendant must establish a prima facie case of purposeful discrimination. Second, if a prima facie case is found, the prosecution must articulate a race-neutral justification for the challenged strikes. Third, after considering both parties' submissions, the trial court must determine whether the defendant has established purposeful discrimination." Maj. Op. 38 (citing *Batson*, 476 U.S. at 96–98; *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003)).

To establish a *prima facie* case under *Batson*'s first prong is, in turn, also a three-part inquiry (though the second step of

to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised." Maj. Op. 42. By contrast, the "exclusion rate" is "calculated by comparing the percentage of exercised challenges used against black potential jurors with the percentage of black potential jurors known to be in the venire." Maj. Op. 42–43.

101

that inquiry is self-answering):

> [First,] the defendant . . . must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.  Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate."  Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.  This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Batson*, 476 U.S. at 96 (citations omitted); *accord Johnson v. California*, 545 U.S. 162, 169 (2005).[42]

The burden of establishing a *prima facie* case is easily met.  In lowering the standard for making out a *prima facie* case

---

[42] In *Powers v. Ohio*, 499 U.S. 400 (1991), the Supreme Court modified the *Batson prima facie* case to allow a defendant to raise a *Batson* challenge in cases where the defendant and the excluded juror are not of the same race.

of discriminatory *voir dire* practice through the use of peremptory strikes, *Batson* pointed to the evidentiary framework for *prima facie* claims in Title VII discrimination cases. *Batson*, 476 U.S. at 93–94 & nn.18–19 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). There the *prima facie* burden is "not onerous." *Burdine*, 450 U.S. at 253. As in the Title VII context, the Supreme Court has emphasized that the overriding purpose is to eliminate discrimination. *See Batson*, 476 U.S. at 99 n.22. It seems only reasonable then that, as with Title VII, the burden for making out a *prima facie* case under *Batson* is also not heavy. *See Johnson*, 545 U.S. at 170 (noting that the *prima facie* case under *Batson*, like in the Title VII context, is not "onerous");[43] *see also Aspen v. Bissonnette*,

_____

[43] In *Johnson*, the Court explained that it "did not intend [*Batson*'s] first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." 545 U.S. at 170. To the contrary, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* While *Johnson* post-dates the decisions in Abu-Jamal's case, it is relevant in pointing out that the low threshold for making a *prima facie* case was clear and has not changed since *Batson*. *See Aspen v. Bissonnette*, 480 F.3d 571, 574 n.2 (1st Cir. 2007) ("Supreme Court opinions issued after the state court decision

103

480 F.3d 571, 574 (1st Cir. 2007) ("[T]he Supreme Court has recently reiterated that the *Batson* prima facie standard is not onerous." (citing *Johnson*, 545 U.S. at 170)).[44]

We should not, therefore, raise the burden higher than what the Supreme Court requires. *See Sorto v. Herbert*, 497 F.3d 163, 178 (2d Cir. 2007) (Pooler, J., dissenting) ("[W]e do both defendants and ordinary citizens a disservice when we create unnecessary obstacles to [the assertion of a *Batson* claim].").

**B.     A Single Improper Strike Is Enough**

*Batson* was "designed to ensure that a State does not use peremptory challenges to strike *any* black juror because of his race."  476 U.S. at 99 n.22 (emphasis added).  Following suit,

---

in question are relevant to the AEDPA analysis to the extent that they restate the clearly established law from earlier Supreme Court opinions.").

[44] In this context, were we to summarize *Batson* in layperson's terms, a defendant needs to raise, based on whatever evidence exists, a reasonable possibility that the prosecutor intended to exclude from the jury but one person because of race.  If so, the prosecutor can counter by presenting race-neutral reason(s) for excluding the person(s) identified.  That done, a Court must evaluate the evidence and determine whether purposeful discrimination did occur.

we have repeatedly said that a defendant can make out a *prima facie* case for jury-selection discrimination by showing that the prosecution struck a single juror because of race. *Holloway v. Horn*, 355 F.3d 707, 720 (3d Cir. 2004) ("Consistent with [*Batson*] principle[s], courts have recognized that a prosecutor's purposeful discrimination in excluding even a single juror on account of race cannot be tolerated as consistent with the guarantee of equal protection under the law." (citing *Harrison v. Ryan*, 909 F.2d 84, 88 (3d Cir. 1990))). In fact, in *United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988), we explained that "[s]triking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks." *Accord Snyder*, 2008 WL 723750, at *4; *Simmons v. Beyer*, 44 F.3d 1160, 1167 (3d Cir. 1995); *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994); *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir. 1987).

Yet the majority focuses on the absence of information about the racial composition and total number of the venire, claiming that this statistical information—from which one can compute the exclusion rate—is necessary to assess whether an inference of discrimination can be discerned in Abu-Jamal's case. Such a focus is contrary to the nondiscrimination principle underpinning *Batson*, and it conflicts with our Court's precedents, in which we have held that there is no "magic number or percentage [necessary] to trigger a *Batson* inquiry," and that "'*Batson* does not require that the government adhere

105

to a specific mathematical formula in the exercise of its peremptory challenges.'" *Clemons*, 843 F.2d at 746 (quoting *United States v. Montgomery*, 819 F.2d 847, 851 (8th Cir. 1987)).

**C.      All Relevant Circumstances Must Be Taken into Account**

Not only is one instance of juror discrimination enough to make a *prima facie* showing, but courts must look at "all relevant circumstances" to determine whether they "give rise to an inference of discrimination." *Batson*, 476 U.S. at 96–97. *Batson* provides a non-exhaustive list of factors. *See id*. at 97 ("These examples are merely illustrative. We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges create[] a prima facie case of discrimination against black jurors."). One of these factors is whether a "'pattern' of strikes against black jurors . . . in the particular venire might give rise to an inference of discrimination." *Id.* Another is "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges[, which] may support or refute an inference of discriminatory purpose." *Id.* In addition to the two factors specifically articulated in *Batson*, our Court has explained that the following factors may be relevant to the analysis: "(1) the number of racial group members in the panel, (2) the nature of

106

the crime,[45] and] (3) the race of the defendant and the victim." *Simmons*, 44 F.3d at 1167; *see also Clemons*, 843 F.2d at 748. This list is not exhaustive, as "[o]ur discussion should not be construed as barring trial judges from addressing other facts and circumstances or as binding trial judges by our illustrative list." *Clemons*, 843 F.2d at 748.

**D.    Consideration of the Relevant Factors Establishes a *Prima Facie* Case**

It is with these factors in mind that I turn to the facts of Abu-Jamal's case developed to date. While there is a limited record in this case—after all, Abu-Jamal's trial took place

---

[45] As an example of how this plays out, in *Riley* we made special mention that the crime gave rise to a capital case: "We cannot avoid noting that *Batson* was not a death penalty case. This is. If the State failed to accord Riley his constitutional right to a jury selected on a race-neutral basis, we must not shirk to so hold." 277 F.3d at 287. The Supreme Court has repeatedly emphasized the need for heightened safeguards in capital cases because "death is different" in harshness and finality from any other punishment. *See, e.g., Ring v. Arizona*, 536 U.S. 584, 614 (2002) (Breyer, J., concurring) ("[The] Eighth Amendment requires States to apply special procedural safeguards when they seek the death penalty."); *Furman v. Georgia*, 408 U.S. 238, 286 (1972) (Brennan, J., concurring) ("Death is a unique punishment . . . ."); *id.* at 289 ("Death . . . is in a class by itself.").

before the Supreme Court had laid out the *prima facie* framework in *Batson*—we do have enough information before us from which to conclude that he established a *prima facie* case of racial discrimination in jury selection. First, Abu-Jamal is black, and therefore "a member of a cognizable racial group." *Batson*, 476 U.S. at 96. Additionally, we know that the prosecutor exercised peremptory challenges against black prospective jurors.[46] Thus, Abu-Jamal clearly meets the first

---

[46] The fact that a prosecutor does not use all of his strikes against blacks or that the actual jury picked has some black members (as here, where there were two black jurors in the end) does not undermine the *prima facie* case. *See Brinson v. Vaughn*, 398 F.3d 225, 233 (3d Cir. 2005) ("[A] prosecutor may violate *Batson* even if the prosecutor passes up the opportunity to strike some African American jurors. . . . Thus, a prosecutor's decision to refrain from discrimination against some African American jurors does not cure discrimination against others."); *Holloway*, 355 F.3d at 720 ("[A] prosecutor who intentionally discriminates against a prospective juror on the basis of race can find no refuge in having accepted others [sic] venirepersons of that race for the jury."); *id.* at 728–29 ("The final composition of the jury . . . offers no reliable indication of whether the prosecutor intentionally discriminated in excluding a member of the defendant's race. . . . A defendant can make a prima facie case of discrimination without reference to the jury's racial makeup.") (citation omitted); *see also Simmons*, 44 F.3d at 1167–68; *Clemons*, 843 F.2d at 747.

prong of *Batson*'s *prima facie* inquiry.

With regard to the second prong, Abu-Jamal is "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." *Id*. (internal quotation marks omitted). Thus, having satisfied the first two prongs of the *prima facie* case, we reach the point where I depart from my colleagues.

To meet the third and final prong of the *prima facie* case—and thus shift the burden to the Commonwealth to articulate race-neutral justifications for the challenged strikes—all Abu-Jamal needs to do is "show that these facts and other relevant circumstances raise an inference that the prosecutor . . . excluded the veniremen . . . on account of their race." *Id*. Bear in mind that Abu-Jamal does not need to prove that the prosecutor was actually acting to strike jurors on account of their race; to the contrary, he only needs to "*raise an inference*" that discrimination was afoot.

---

Moreover, the defense's striking putative black jurors is not a reason to defeat a *Batson* claim. *Brinson*, 398 F.3d at 234 ("Suppose that the defense dismisses a particular African American juror for a permissible non-racial ground and that the prosecution then strikes other African American jurors based on their race. The legitimate defense strike would not open the door for illegitimate prosecution strikes.").

We know that the prosecutor exercised 15 peremptory strikes, 10 of which were used to remove black venirepersons. *Commonwealth v. Abu-Jamal*, No. 1357, 1995 WL 1315980, at *103 (C.P. Ct. Phila. Cty. Sept. 15, 1995) (hereinafter *PCRA Op.*). That means that the "strike rate" for blacks was 66.67%. As the Supreme Court has noted, "[h]appenstance is unlikely to produce this disparity." *Miller-El*, 537 U.S. at 342 ("In this case [where 10 of 14 peremptory strikes were used against black venirepersons, resulting in a strike rate of 71.43% and an exclusion rate of 91%] the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors.").[47] It is my belief that the 66.67% strike rate, without reference to the total venire, can stand on its own for the purpose of raising an inference of discrimination. *See Batson*, 476 U.S. at 97.

My colleagues attempt to downplay the strike rate by saying that it is essentially meaningless without reference to the racial makeup of the venire as a whole. They claim it is

---

[47] In *Miller-El*, the Supreme Court had available both the strike rate and the racial composition of the venire, which allowed it to calculate the exclusion rate. Thus, the Court could determine that the prosecution used 10 of its 14 strikes (a 71.43% strike rate) to strike 91% of the eligible black venire pool. 545 U.S. at 240–41. Here, we do not have information about the racial composition of the total venire pool, but we have a similarly striking strike rate.

impossible to understand such a high strike rate without "contextual markers" about the entire jury venire. Maj. Op. 47. While such "markers" would be helpful, the lack of a record containing that information should not serve as an absolute bar to Abu-Jamal's claim.[48] Simply put, the failure to develop a record of the entire venire pool or all black members in that pool (against which to compare the prosecutor's use of peremptory strikes) does not defeat a *prima facie Batson* claim. This is because *Batson* does not place the burden on the petitioner to

---

[48] My colleagues correctly assert that Abu-Jamal had the burden of establishing his *prima facie* case. They note—as did the Court of Common Pleas on PCRA review and the District Court—that Abu-Jamal had the opportunity at a 1995 PCRA hearing to take testimony from the trial prosecutor, Joseph McGill, but chose not to do so. Maj. Op. 47–49; *PCRA Op.*, 1995 WL 1315980, at *21 n.8; *Abu-Jamal*, 2001 WL 1609690, at *106. My colleagues contend that Abu-Jamal's decision not to elicit McGill's testimony is "noteworthy," and they intimate that such testimony would have shed light on the strike and exclusion rates. Maj. Op. 48 n.19, 49. However, McGill's testimony goes to whether he had race-neutral reasons at *Batson* step two that could explain an otherwise *prima face* claim at *Batson* step one (assuming that Abu-Jamal established one). Abu-Jamal's failure to question the prosecutor should not, and cannot reasonably, be taken into consideration to defeat a *prima facie* claim. The cart (step two) cannot come ahead of the horse (step one).

develop a full statistical accounting in order to clear the low *prima facie* hurdle of the *Batson* analysis. *See Holloway*, 355 F.3d at 728.

In *Holloway*, we emphasized that "requiring the presentation of [a record detailing the race of the venire] simply to move past the first [*prima facie*] stage in the *Batson* analysis places an undue burden upon the defendant." *Id.* at 728. There we found that the strike rate—11 of 12 peremptory strikes against black persons—satisfied the *prima facie* burden despite the lack of contextual markers my colleagues now seek here.[49] *Id.* at 729;[50] *see also Simmons*, 44 F.3d at 1168.

---

[49] My colleagues assert that *Holloway* is distinguishable because the Court did not apply AEDPA's deferential standard of review, finding instead that the pre-AEDPA standard of *de novo* review was appropriate. Maj. Op. 49 n.21. However, our Court "note[d] that relief would be warranted even if our analysis were confined by the requirements of AEDPA, as the Pennsylvania Supreme Court's PCRA decision was 'contrary to' and an 'unreasonable application of' the *Batson* standard." *Holloway*, 355 F.3d at 729.

[50] In *Holloway*, we specifically rejected the requirement that a petitioner develop a complete record of the jury venire when we rejected Pennsylvania's so-called *Spence* rule. In *Commonwealth v. Spence*, the Pennsylvania Supreme Court affirmed the denial of a capital defendant's *Batson* challenge on

112

We have relied on the strike rate alone despite the absence of other contextual markers in post-AEDPA cases.  In *Brinson v. Vaughn*, 398 F.3d 225 (3d Cir. 2005), we ruled that

the ground that he failed to make an adequate record to permit meaningful review of the trial court's failure to find a *prima facie* case.  627 A.2d 1176, 1182–83 (Pa. 1993) (noting that the defendant has not "specifically identif[ied] the race of all the veniremen who had been removed by the prosecution, the race of the jurors who served, or the race of jurors acceptable to the Commonwealth who had been stricken by the defense").  In *Holloway*, we deemed the *Spence* rule inconsistent with *Batson*'s burden-shifting framework:

> Notably absent from the *Batson* discussion of the prima facie case is any call for trial judges to seek the type of statistical accounting required by the *Spence* rule nor do we see how such an accounting fits within *Batson*'s first step.  A trial judge undoubtedly might find in a given case that a full accounting regarding the race of the venire and the jurors struck would be helpful at the third stage of the *Batson* analysis, after it has heard the prosecutor's explanation for the strikes and must "determine if the defendant has established purposeful discrimination."  But requiring the presentation of such a record simply to move past the first stage in the *Batson* analysis places an undue burden upon the defendant.

355 F.3d at 728 (citation omitted).

113

it was an unreasonable application of law to find that the petitioner had not made out a *prima facie* case where the prosecutor had allegedly used 13 of his 14 peremptory challenges against black potential jurors. *Id.* at 235. We did not have information about the total venire or number of black persons in that venire, but we nevertheless held that "[t]he pattern of strikes alleged by the defense is alone sufficient to establish a prima facie case under the [present] circumstances." *Id.* This was so even though "other factors suggestive of possible racial discrimination on the part of the prosecution [we]re not present in the record of th[e] case." *Id.* We emphasized that "[s]uch a pattern, of course, does not necessarily establish racial discrimination, but particularly in the absence of any circumstance (such as a venire composed almost entirely of African Americans) that might provide an innocent explanation, such a pattern is more than sufficient to require a trial court to proceed to step two of the *Batson* procedure." *Id.*

Furthermore, in *Hardcastle* we also faced the problem of an underdeveloped record. And yet we concluded (at least implicitly[51]) that a *prima facie* case existed by relying on the

---

[51] I say "implicitly" because we read the Pennsylvania Supreme Court's opinion as conceding that the petitioner had satisfied his *prima facie* burden under *Batson*'s first step. *Hardcastle*, 368 F.3d at 256. However, we independently concluded that this conclusion was "appropriate" "[i]n view of the fact that twelve of the prosecutor's peremptory strikes were

114

strike rate, where the prosecutor used 12 of her 20 strikes against black candidates for the jury.[52]  We remanded the case for an evidentiary hearing to allow the Commonwealth to offer race-neutral reasons and for a reexamination of the merits of *Batson* on steps two and three.

Inasmuch as decisions of the lower federal courts are illustrative of what is reasonable—and *Brinson* and *Hardcastle* are decisions of our own Court—they are instructive of the outcome in this case.  Abu-Jamal made out a *prima facie* case, calling for the courts to go further to test whether racial

---

exercised against African-American members of the venire." *Id.*

[52] When our Court considered *Hardcastle*, we knew that "the prosecutor used her peremptory strikes, of which she had a total of twenty, to remove twelve of the fourteen African-American members of the venire."  368 F.3d at 251.  On remand to the District Court, the record was clarified that in fact the prosecutor only used fifteen of the available twenty peremptory strikes—twelve to remove black potential jurors, one to remove a Hispanic potential juror, and two to remove white potential jurors.  *See Hardcastle v. Horn*, 521 F. Supp. 2d 388, 392 (E.D. Pa. 2007).  This new information does not, of course, undermine our Court's conclusion that when a prosecutor uses twelve of an available twenty peremptory challenges to remove black potential jurors, it is appropriate to find that the petitioner has met his *prima facie* burden.

discrimination tainted the makeup of the jury that decided his guilt, and the failure of the Pennsylvania Courts to recognize this was an unreasonable application of the law.

Yet even setting aside statistical calculations about the strike and exclusion rates, the other relevant factors in this case further demonstrate that Abu-Jamal has satisfied his *prima facie* burden. At the very least, my colleagues and the Pennsylvania Courts should have considered that this was a racially charged case, involving a black defendant and a white victim. *See Simmons*, 44 F.3d at 1168 ("The nature of the crime and its racial configuration . . . contribute significantly to [a] prima facie case.").[53] It is further noteworthy that Abu-Jamal was a member of the Black Panther Party and that he was charged with killing a police officer. Finally, it cannot be ignored that this is a capital case. *See Riley*, 277 F.3d at 287.

My colleagues dispense with these considerations in a footnote, stating merely that "Abu-Jamal has not demonstrated that these allegations make the Pennsylvania Supreme Court's

---

[53] In *Simmons*, we had no record of the total venire, yet we nevertheless found that the defendant had established a *prima facie* case based on "[t]he combination of Simmons' race, the prosecution's exclusion of at least one potential African American juror, and the circumstances surrounding the crime," which involved "the murder and robbery of an elderly [C]aucasian physician by a young African American man." 44 F.3d at 1168.

116

decision objectively unreasonable." Maj. Op. 46 n.17. Their cursory consideration of these critical factors mirrors that of the Pennsylvania Courts. I believe this misapplies *Batson*, for it fails to "consider all relevant circumstances" of our case.

I am mindful that, under AEDPA, our role is to determine whether "[t]he state court's application of clearly established law [was] objectively unreasonable." *Lockyer*, 538 U.S. at 75. However, because *Batson*'s *prima facie* burden is low-set, and after looking at the strike rate and other relevant factors in this case, I conclude that it was objectively unreasonable for the Pennsylvania Supreme Court to determine that Abu-Jamal failed to make out a *prima facie* case. I would hold that Abu-Jamal met his *prima facie* burden and remand to the District Court to hold a hearing to complete the *Batson* analysis. *See Hardcastle*, 368 F.3d at 261–62.

### III. Conclusion

*Prima facie* means "[a]t first sight." Black's Law Dictionary 1228 (8th ed. 2004). I believe that Abu-Jamal presents a case that, at first sight, infers (*i.e.*, suggests) a reasonable possibility that the prosecutor excluded potential black jurors because of race. This inference requires courts to look further. To move past the *prima facie* case is not to throw open the jailhouse doors and overturn Abu-Jamal's conviction. It is merely to take the next step in deciding whether race was impermissibly considered during jury selection in his case. Having determined that Abu-Jamal met his *prima facie* burden

117

at step one, I would remand for the District Court to complete an analysis of the remaining steps of the *Batson* claim, starting at step two, where the burden shifts to the Commonwealth to "come forward with a neutral explanation for challenging black jurors." *Batson*, 476 U.S. at 97. If the Commonwealth does so, the Court should proceed to step three and assess whether the reason(s) given are valid or pretextual in determining, on the basis of the evidence presented, whether purposeful discrimination did occur. *See id.* at 98.

No matter how guilty one may be, he or she is entitled to a fair and impartial trial by a jury of his or her peers. As *Batson* reminds us, "[t]he core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of . . . race." *Id.* at 97–98. I fear today that we weaken the effect of *Batson* by imposing a contemporaneous objection requirement where none was previously present in our Court's jurisprudence and by raising the low bar for a *prima facie* case of discrimination in jury selection to a height unattainable if enough time has passed such that original jury records are not available. In so holding, we do a disservice to *Batson*. I respectfully dissent.